410 So.2d 292 (1982)
Vera GIANECHINI, Individually and as Natural Tutrix of the Minor Child David Gianechini and Executrix of the Estate of Ernest Gianechini
v.
CITY OF NEW ORLEANS, New Orleans Fire Department, Arthur Turner, Joseph Fricano, Early American Insurance Company and XYZ Insurers.
No. 12422.
Court of Appeal of Louisiana, Fourth Circuit.
February 9, 1982.
Writ Denied April 15, 1982.
*294 Sessions, Fishman, Rosenson, Boisfontaine & Nathan, Robert E. Winn, J. David Forsyth, New Orleans, for plaintiff-appellant.
Ronald J. Favre, New Orleans, for City of New Orleans & New Orleans Fire Department.
John P. Nelson, Jr., New Orleans, for Arthur Turner & Joseph Fricano, defendants-appellees.
Before GULOTTA, BYRNES and WILLIAMS, JJ.
GULOTTA, Judge.
The surviving spouse and minor child of Ernest Gianechini appeal from the dismissal of their suit against the City of New Orleans and two individual firemen, Arthur Turner and Joseph Fricano, for negligence in rendering emergency assistance to Gianechini. We affirm.
Ernest Gianechini suffered a heart attack while dining with business associates at the Andrew Jackson Restaurant on Royal Street in New Orleans at approximately 9:45 p. m. on September 16, 1976. Within seconds, a bystanding paramedic and another man, identified as a doctor, rushed to his aid. After determining he had no pulse and was not breathing, the two began to administer cardio-pulmonary resuscitation (CPR) within forty-five seconds to one minute after the onset of the attack.
Within three to five minutes of Gianechini's initial distress, a New Orleans Fire Department emergency vehicle manned by defendants Turner and Fricano arrived on the *295 scene. Turner administered oxygen to the victim for a few moments with an Emerson resuscitator[1] before resuming CPR using the mouth-to-mouth method. Gianechini was then placed on a stretcher and wheeled to the ambulance.
The emergency vehicle, driven by Fricano, arrived at the emergency room of Charity Hospital within ten minutes after the onset of the attack. During the three to five minute ride from the restaurant to the hospital, Gianechini was attended by fireman Turner, who continued to perform chest compressions, and James P. Murphy, a medically untrained associate of Gianechini, who administered oxygen mechanically through a mask at Turner's instructions.
At Charity Hospital, Gianechini's heartbeat was restored. It was subsequently determined, however, that although his heart attack had not been massive, he had suffered brain damage from lack of oxygen during the cardiac arrest. In April, 1977, he died from resulting medical complications.
Plaintiffs claim the decedent's brain damage and death were caused by the negligent acts or omissions of the two firemen at the restaurant and en route to Charity Hospital. They sought to prove that proper CPR had been administered by the two bystanders at the restaurant and that the firemen had failed to continue this life-saving technique properly. Plaintiffs seek recovery against the City based on respondeat superior and also under LSA-C.C. Art. 2317[2] and negligence theories because of the City's failure to staff its ambulance with properly trained personnel and to equip them with effective safety devices. Plaintiffs also complain that the trial judge erred in ordering a bifurcated jury trial on the liability of the firemen and a judge trial on the City's liability. They additionally complain of various errors during trial.

BIFURCATED TRIAL
Over the objection of the plaintiffs, who had prayed for a jury determination of all issues as to all defendants, the trial judge conducted a "bifurcated" trial whereby the jury determined the liability of the individual firemen while the judge sat as trier of fact of the City's culpability. The trial judge based his ruling on LSA-R.S. 13:5105, which provides: "No suit against the state or a state agency or political subdivision shall be tried by jury."
Plaintiffs, appealing, contend that LSA-R.S. 13:5105 violates the equal protection provisions of the Louisiana and United States Constitutions and is an unconstitutional application of the doctrine of sovereign immunity, which was abolished by Article 12, § 10 of the 1974 Louisiana Constitution. We disagree.
The validity of LSA-R.S. 13:5105 has been upheld as a proper exercise of legislative authority to provide a "procedure" for suits against the state and its political subdivisions under LSA-Const. Art. 12, § 10. Jones v. City of Kenner, 338 So.2d 606 (La. 1976); Carter v. City of New Orleans, 327 So.2d 488 (La.App. 4th Cir. 1976). Controlled by these cases, we reject plaintiffs' constitutional arguments. Accordingly, we conclude the trial judge properly "bifurcated" the trial and had the issues determined separately.

GROSS NEGLIGENCE STANDARD
Turner's liability as an emergency vehicle attendant was submitted for the jury's determination on a "gross negligence" standard, whereas Fricano's liability as driver of *296 the vehicle was submitted on ordinary negligence. This disparity of standards arises from LSA-R.S. 37:1732(A) and (C) which afford firemen "certified" in first aid training a limited immunity from liability for emergency medical assistance "... except for acts or omissions intentionally designed to harm or grossly negligent acts or omissions which result in harm" to the injured victim.[3] Undisputed evidence indicated that Turner had received certification as an Emergency Medical Technician (EMT), whereas Fricano had only received basic first aid training by the fire department and had no certification.
Although no issue is raised as to the standard of care applied to Fricano, plaintiffs contend that the "gross negligence" standard set forth in LSA-R.S. 37:1732 should not be applied to Turner's behavior since the statute is unconstitutionally vague.
A statute violates due process if the language is so vague that men of common intelligence must guess at its meaning. State v. Baker, 359 So.2d 110 (La. 1978). We cannot say that LSA-R.S. 37:1732(A) and (C) are impermissibly ambiguous concerning certification requirements of firemen. In our case, it is clear that fireman Turner had received EMT training and while currently certified by the American Red Cross and the National Register of Emergency Technicians rendered "emergency care, first aid or rescue while in the performance of his duties at the scene of an emergency" and moved Gianechini "to a hospital or other place of medical care" as provided by the statute. Accordingly, we conclude that Turner clearly falls within the provisions of LSA-R.S. 37:1732(A) and (C), and we find no merit to plaintiffs' argument based on statutory vagueness.

CITY'S STANDARD OF CARE
In determining the City's liability, the trial judge employed an ordinary negligence standard and refused to apply LSA-R.S. 37:1732(B), which by its terms would permit the City to benefit from the gross negligence standard applicable to its employee-fireman.[4] He declared that LSA-R.S.
*297 37:1732(B) was unconstitutional as violative of equal protection.
Because the trial judge concluded the negligence of the City "was not a substantial factor in causing the harm ...", a determination with which we agree, the question whether the statutory gross negligence standard is applicable or unconstitutional is moot. Courts do not pass upon the constitutionality of a statute if the case can be decided on another ground. State v. Stripling, 354 So.2d 1297 (La. 1978).

LIABILITY OF FIREMEN
At the outset, we need only briefly mention that the evidence overwhelmingly supported the jury's conclusion that fireman Fricano, the driver of the emergency vehicle, was not guilty of negligence in transporting Gianechini from the Andrew Jackson Restaurant to the Charity Hospital emergency room. It was undisputed that Fricano completed the trip in three to five minutes driving at the maximum speed that safety permitted. Furthermore, the weight of the evidence was that Fricano's failure to notify the hospital in advance of his arrival with the cardiac arrest victim had no discernable effect on the treatment he received in the emergency room.
A more difficult question for the jury, however, was determining whether fireman Turner, the emergency vehicle attendant, was grossly negligent in rendering improper CPR to Gianechini resulting in decedent's brain damage and death.
A factual dispute existed concerning the procedure used by Turner during the ambulance ride. According to Turner, he instructed the layman, Murphy, to hold an oxygen mask over Gianechini's nose and mouth and to administer oxygen at Turner's signal. The fireman testified that after every five chest compressions he nodded to Murphy to administer oxygen by depressing an Ohio demand valve and releasing it at a second nod of the head after Gianechini's lungs were inflated. Turner stated that at least 36 times on the ride to the hospital he gave nodding signals to Murphy to depress the button and release it again.[5] According to expert witnesses, the method described by Turner would be an effective form of CPR.[6]
Murphy's testimony, on the other hand, was that Turner had simply handed him an oxygen mask in the ambulance, and told him to hold it over the victim's face and press the button. According to Murphy, he was never told to take pressure off the button at any time and was not given any kind of signal by Turner. Murphy stated that he held the mask over Gianechini's face and did not release the button unless he was wiping away vomitus on at least two or three occasions on the way to the hospital. If Murphy's version were believed, such CPR would probably not have been effective.
A second factual dispute concerned the physical condition of Gianechini in the minutes following his heart attack. According to medical testimony, the pupils of cardiac arrest victims dilate within one minute of arrest as the brain is deprived of oxygen. When the flow of oxygen is restored the pupils constrict or become smaller and react to light but they do not become "pinpointed" or very small and unreactive. According to the deposition of John T. Williams, the bystanding emergency medical technician *298 who rendered emergency CPR in the restaurant before the arrival of the firemen, Gianechini's pupils began to dilate or get wider (a sign of cardiac arrest) within seconds after the onset of the attack, but the victim's color remained pink and his pupils constricted and remained "very small, pinpointed" after CPR began. When asked if his pupils reacted to the light, Williams testified that they "just remained constricted", a significant indication, according to this witness, that effective CPR was being administered. According to Turner, however, Gianechini's pupils were "pinpointed" and non-reactive to the light, representing possible brain damage.
Apart from these factual contradictions in the evidence, expert testimony concerning the effectiveness of CPR as a life-saving technique was also conflicting, based on statistical studies of survival rates of patients who had been administered CPR. Although plaintiff's experts estimated survival rates ranging from 70-95%, defendants' experts placed the rate as low as 15%.[7] Irrespective of the differences in percentages, a reasonable inference from the testimony is that CPR is not a cure-all. Significantly, plaintiffs' medical experts acknowledged that properly performed CPR is not always effective in preventing brain damage and death.[8]
Medical experts responded to hypothetical questions about the onset of the decedent's brain damage. Dr. Edward Gaber, plaintiffs' expert in internal medicine and CPR, was of the opinion that Gianechini's brain damage probably occurred during the ambulance ride, based on assumptions that he had received proper two-man CPR in the restaurant for five minutes, that his pupils had remained constricted and his color pink, and that he had only received chest compressions from Turner and oxygen from the Emerson resuscitator or from a demand valve used by his untrained friend during the ambulance ride. Significantly, however, Dr. Gaber acknowledged that he did not know Gianechini's skin color or the condition of his pupils upon arrival at Charity.[9] He testified that if those signs had been the same at Charity as when he had left the *299 restaurant, he could not say at what point brain damage had started. Furthermore, this physician testified that the easy defibrillation of Gianechini at Charity Hospital indicated "something right" had been done, partially in the ambulance, prior to his arrival at the hospital.
Dr. Robert Martinez, a neurologist called by plaintiffs, could not say, from an examination of the hospital records, at what point after the attack Gianechini had become brain damaged. Based on an assumption that he had received effective CPR in the restaurant and his pupils had been erroneously described by Williams as "pinpointed", he was of the opinion that the brain damage probably occurred after he had left the restaurant. Significantly, however, this physician also testified that to give a better opinion of when the brain became damaged it would be important for him to know what Gianechini looked like upon arrival at the Charity emergency room. Assuming the skin color, pupils and other signs were the same upon arrival at the hospital as at the restaurant, he acknowledged it could be concluded that brain damage could have occurred in the restaurant.
Defendants' experts were of the opinion that Gianechini had suffered brain damage at the restaurant before the firemen's arrival. Dr. Edward Howell, an expert in emergency medicine, felt that it was highly probable that Gianechini had aspiration at the restaruant whereby foreign materials went into his respiratory system sufficiently to prevent effective CPR. In his opinion, the victim's initial vomitting and regurgitation at the restaurant impeded effective CPR and caused difficulty in ventilating him and allowing oxygen to enter the lungs. He believed that Gianechini had demonstrated pulmonary atelectasis or collapse, aspiration of gastric content, some pulmonary edema, and capillary profusion disorder, or a lung collapse whereby blood does not get oxygenated. He also felt that the finding of "pinpointed" pupils by Williams at the restaurant indicated that Gianechini had cerebral inoxia causing brain damage as pointed out in the autopsy. According to Dr. Howell, Gianechini's continuing regurgitation at the restaurant meant that excessive pressure was necessary to ventilate his lungs. Significantly, this physician also testified that the treatment Gianechini received in the ambulance "was certainly not detrimental to the patient" since he was resuscitated without too much trouble after arrival at Charity Hospital.
Similarly, Dr. Richard A. Paddison, defendants' expert neurologist, was also of the opinion that Gianechini's brain damage had probably occurred before the firemen came to the restaurant and "in spite of" the CPR he received. This physician was of the opinion that something "catastrophic" had occurred in the victim's nervous system, including his brain and brain stem, taking into account the factors that he was comatose, unresponsive, not breathing on his own, and his pupils were "pinpointed" at the restaurant.
The defendants' case was also buttressed by the testimony of Lonnie M. Campbell, a paramedic accepted as an expert EMT, who was of the opinion that Gianechini's brain damage had occurred in the restaurant before the arrival of the firemen. This witness stated that even if proper CPR had been started in the restaurant within one minute by two qualified people and continued until the patient was brought to Charity, he could not say he would have survived without permanent brain damage since he could have aspirated vomitus impairing his ability to get oxygen into his blood.
Considering the lay and expert testimony, we cannot say the jury erred in exonerating Turner from liability for Gianechini's brain damage and death. If Turner's testimony concerning use of the Ohio demand valve equipment and the head-nodding signals to Murphy during the ambulance ride, though disputed, is believed, the jury could have concluded that he performed proper CPR and there was no showing of any negligence, much less gross negligence. The undisputed medical testimony was that brain damage can occur even with proper CPR. In other words, the occurrence of brain damage does not necessarily mean improper *300 CPR has been performed. Evidence that proper CPR was performed in the restaurant and that Gianechini arrived at Charity Hospital with brain damage does not establish that Turner did not administer proper CPR or that his treatment in the ambulance caused the brain damage.
In short, the plaintiffs simply failed to show that Turner had performed improper CPR that was a cause in fact of the victim's brain damage. This conclusion finds support in defendants' expert medical testimony, although disputed by plaintiffs' experts, that Gianechini very well could have suffered irreversible brain damage at the restaurant despite Williams' efforts and proper CPR even before the firemen arrived on the scene. The evidence supports the jury's conclusion that Turner was not "grossly negligent."

CITY'S LIABILITY
Although it is true, as pointed out by the trial judge, that the emergency vehicle manned by Turner and Fricano failed to meet the accepted standards for emergency vehicle equipment by its lack of a hand operated bag-mask unit, portable suction unit, portable oxygen unit, we find no error in the trial judge's further conclusion that "... the City's negligence was not a substantial factor in causing the harm which was sustained by Ernest Gianechini." We cannot conclude the record supports a finding that brain damage occurred after the arrival of the firemen and that improper CPR was administered because of lack of equipment.
Although Turner had no portable aspirator or portable demand oxygen equipment for use in the restaurant and in transporting Gianechini to and from the emergency vehicle, the evidence, though conflicting, does not indicate that CPR was interrupted for more than 15 seconds, the accepted maximum time of interrupting CPR in transporting the victim, or that the overall effectiveness of the CPR actually performed was diminished significantly. Moreover, if Turner's version of the events is accepted as true, his limited use of the Emerson resuscitator was not detrimental. Accordingly, we conclude that no showing was made that the faulty or missing equipment was a cause-in-fact of the brain damage.

TRIAL ERRORS
As grounds for reversal, plaintiffs also cite certain alleged errors or improprieties occurring at trial. We find no merit to these contentions.
Plaintiffs argue that the trial judge erred in withholding from the jury the City's obligation to pay any judgment rendered against the individual defendants Turner and Fricano, while permitting, over plaintiffs objection, evidence of the firemen's limited financial ability to respond in judgment. This argument is addressed to quantum. Because the firemen and the City were exonerated from liability, no necessity exists to consider this alleged trial error.
During trial, the judge interrupted the questioning of one of plaintiffs' medical experts and stated that he could not give his opinion in response to a hypothetical question unless he could do so "to a reasonable medical certainty" rather than on a "probability standard." Later in the trial, the judge denied plaintiffs request for mistrial, and told the jury to disregard his previous comment concerning "reasonable medical certainty". He further instructed the jury that the causal relationship between the injury and the brain damage could be considered "as a medical certainty, a more reasonable than not, probable than not, or a reasonable probability." Furthermore, the court clarified the degree of proof in his final charge to the jury. Although plaintiffs argue that the effect of the judge's error concerning the degree of proof of medical causation was "devasting", we conclude, considering the record as a whole, that any initial prejudice was removed by the trial court's corrective instructions and final charge to the jury. Under these circumstances, we find no reversible error. Accordingly, we reject plaintiffs' contention *301 that the jury's findings are not entitled to the benefit of the manifest error rule.
We likewise are not persuaded by plaintiffs' arguments concerning the trial judge's charge to the jury on the issue of proximate cause. The judge described proximate cause as one "without which the accident could not have happened" and referred to it as the "procuring, efficient or predominant cause". Plaintiffs contend the judge's explanation was erroneous since proximate causation need not be the predominant causation but only a "substantial factor" in causing the injury. Although the trial court's charge to the jury may not have been couched in the precise terms preferred by plaintiffs, we cannot say that the court's language was so confusing or misleading as to constitute reversible error. Moreover, in the written interrogatories, the jurors were asked if Turner's gross negligence or Fricano's negligence was "a proximate cause or a substantially contributing factor producing Mr. Gianechini's death." Accordingly, any error in the trial judge's charge concerning causation was harmless.
As a final ground for reversal, plaintiff contends that a mistrial should have been granted when counsel for defendant, during his closing arguments to the jury, stated, in effect, that a verdict for plaintiffs "ends emergency service in New Orleans". Although this statement was obviously improper, we find no error in the trial judge's denial of the motion for a mistrial. Upon plaintiffs' immediate objection to the comment, the judge instructed the jury to disregard the remark. Any prejudice in the jury's mind was thereby dispelled.
Accordingly, the judgments are affirmed.
AFFIRMED.
NOTES
[1] An Emerson resuscitator is a pressure-cycled device whereby oxygen is pumped into the victim's lungs and released once a certain pre-set pressure is reached. The Emerson resuscitator cannot be used to ventilate a victim's lungs during CPR because the chest compressions trigger the machine to release the air and adequate oxygen does not reach the victim's lungs.
[2] LSA-C.C. Art. 2317 provides as follows:

"Art. 2317. Acts of others and of things in custody.
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
[3] LSA-R.S. 37:1732(A) and (C) provide:

"A. Any fireman, policeman or member of an ambulance or rescue squad who holds a valid current certification by the American Red Cross, L.S.U. Fireman Training Rescue Program or United States Bureau of Mines, who renders emergency care, first aid or rescue while in the performance of his duties at the scene of an emergency, or moves a person receiving such care, first aid or rescue to a hospital or other place of medical care shall not be individually liable to such person for civil damages as a result of acts or omissions in rendering the emergency care, first aid, rescue or movement of such person receiving same to a hospital or other place of medical care except for acts or omissions intentionally designed to harm or grossly negligent acts or omissions which result in harm to such person, but nothing herein shall relieve the driver of an ambulance or other emergency or rescue vehicle from liability arising from the operation or use of such vehicle.
. . . . .
C. In order for any fireman, policeman or member of an ambulance or rescue squad to receive the benefit of the exemption from civil liability provided for herein, he must first have taken and successfully completed the standard first aid course recognized or approved by the American Red Cross or the United States Bureau of Mines or the L.S.U. Fireman Training Rescue Program and further he shall have a valid certification from the Red Cross or the United States Bureau of Mines or the L.S.U. Fireman Training Rescue Program that he has successfully completed any necessary training or refresher courses, or shall have successfully completed a first aid course having standards at least equal to the standard first aid course recognized or approved by the American Red Cross or the United States Bureau of Mines or the L.S.U. Fireman Training Rescue Program."
[4] LSA-R.S. 37:1732(B) provides:

"B. The immunity herein granted to a fireman, policeman or member of an ambulance or rescue squad in accordance with Subsection (A) of this section shall be personal to him and shall not inure to the benefit of any employer or other person legally responsible for the acts or omissions of such fireman, policeman or member of an ambulance or rescue squad nor shall it inure to the benefit of any insurer, except that no parish governing authority engaged in rendering ambulance services nor its insurer with respect to such ambulance services shall be liable for the act or omission of any member of any ambulance squad employed by it unless such individual would be personally liable therefor under the provisions of Subsection (A) hereof."
[5] When the button on the Ohio demand valve is pressed, oxygen is forced into the victim's lungs and when the button is released the flow of oxygen stops. This form of ventilation, unlike the Emerson resuscitator (see footnote 1, supra), can be used in CPR.

The emergency vehicle was equipped with a working Ohio demand valve connected to an oxygen source. Turner's trial testimony concerning use of the Ohio demand valve and the nodding signals in the ambulance differed from his earlier deposition where he did not mention switching from the Emerson to the Ohio.
[6] Plaintiffs medical expert, Dr. Edward Gaber, stated that use of an untrained layman who pressed a button on a demand oxygen system at the nod of an EMT's head in connection with chest compressions would be an acceptable method of CPR if done correctly. Dr. Warren K. Carter, also called by plaintiffs, felt it was "perfectly fine" for an EMT to use lay help if properly observed.
[7] Dr. Arthur Wayne Owens, plaintiffs' expert in internal medicine, cardiology and CPR, testified that proper CPR instituted within one minute and continued until a hospital is reached results in a survival rate of 70-80% on a national average, and approaches 95% of individuals with ventricular fibrillation. On cross-examination Dr. Owens acknowledged that the salvage rate in Seattle, which has a better emergency program than New Orleans, is initial out-of-hospital resuscitation of 40% of patients and discharge as long term survivors of 25%.

Dr. John Lownry, Ph.D., an emergency medical service officer, testified that the survival rate is "pretty low". According to Lowry, studies of patients in 1974-76 responded to in three minutes or less indicated only 16% survived to discharge from the hospital, and of the survivors one-half had severe neurological deficits and had to be admitted to nursing homes.
Dr. Edward Gaber, plaintiffs' expert in internal medicine and CPR, stated that his personal success rate in reviving a person from cardiac arrest through CPR is "two out of three" and that the "current thinking" is a success rate up to 80% if CPR is within one minute of the onset of cardiac arrest and a better rate for ventricular fibrillation.
Dr. Warren K. Carter, an expert in emergency medicine testified that proper CPR administered to a man in Mr. Gianechini's condition would give him a "reasonably good chance for survival after advanced cardiac support at hospital."
Dr. Richard M. Paddison, defendants' expert neurologist, cited a 1979 study that showed a mortality rate of 73-80% of patients who suffered an out-of-hospital arrest and were comatose on arrival at the hospital.
Dr. Edward Howell, defendants' expert in emergency medicine, testified that a December, 1977 study of patients who went into ventricular fibrillation in front of a paramedic with all the equipment available showed only 43% survived. According to Howell, a Seattle study of 1975 showed only 40% of patients in ventricular fibrillation outside the hospital were initially resuscitated and only 25% were discharged as long-term survivors. He said that average success rates for out-of-hospital cardiac resuscitation from 1973-78 show 14.9% of persons survive to leave the hospital.
[8] Dr. Arthur Owens testified that under the best of circumstances CPR is not always effective, and he had no opinion about the treatment administered to Gianechini.

Dr. Edward Gaber did not feel that all CPR, no matter how properly given, is always effective.
[9] There is no record of Gianechini's condition upon arrival at the emergency room of Charity Hospital.