600 So.2d 701 (1992)
Wilford Knighton SHARKEY, Sr., Individually and as Legal Tutor of the Estate of Sherry Lynn Fugler, and Doris McDaniel Sharkey, Individually and as Legal Undertutrix of the Estate of Sherry Lynn Fugler
v.
STERLING DRUG, INC., et al.
No. CA 91 0890.
Court of Appeal of Louisiana, First Circuit.
April 23, 1992.
*704 Paul H. Dué, Baton Rouge, and Joseph Simpson, Amite, for plaintiff-appellant Wilford Sharkey, etc.
Lawrence S. Kullman, New Orleans, and Leonard A. Blackwell, III, Gulfport, Miss., for plaintiff.
John Phelps Hammond, James B. Irwin, New Orleans, Duncan S. Kemp, III, Hammond, and Kathryn M. Forgie, Santa Monica, Cal., for defendant-appellant Sterling Drug, Inc.
Franklin D. Beahm and Robert Ford, New Orleans, for Evans Ray Glasgow.
Mack E. Barham, Robert E. Arceneaux, New Orleans, for appellant.
Before LOTTINGER, EDWARDS and LeBLANC, JJ.
EDWARDS, Judge.
In October, 1981, Sherry Fugler, aged five, ingested adult strength Bayer aspirin and contracted Reye's Syndrome. As a result of the illness, the child suffered severe permanent brain damage resulting in moderate mental retardation. This action, filed on behalf of the child by her maternal grandparents, Doris and Wilford Sharkey, is a claim in products liability against Sterling Drug, Inc. (Sterling), and a claim in redhibition and negligence against Evans Ray Glascow d/b/a Thrift Town Pharmacy (Glascow), the seller of the aspirin.

ACTION OF THE TRIAL COURT
After a lengthy bench trial, the trial court found that Sherry Fugler had ingested Bayer aspirin, that this caused her Reye's Syndrome, that Bayer aspirin was an unreasonably dangerous product and that Sterling was strictly liable to the plaintiffs. The trial court also found that Glascow was not liable, and dismissed the plaintiffs' action against him. Sterling appeals *705 the judgment rendered against it, and in favor of the Sharkeys, individually and as legal tutors of Sherry Fugler, in the full sum of $9,324,964.31, together with legal interest from the date of judicial demand, and all costs of the proceeding. The Sharkeys answered the appeal and assign error to the trial court's dismissal of their claim against Glascow.

BACKGROUND FACTS
Sherry Fugler was born on January 12, 1976. On January 20, 1981, her mother died from a cerebral hemorrhage. Although Sherry's natural tutorship befell, of right, to her father, Robert Fugler, (see LSA-C.C. art. 250), she and her sister immediately went to live with their maternal grandparents, the Sharkeys, who undertook full responsibility of the care and custody of the children.
On October 5, 1981, Mrs. Sharkey took Sherry, who was exhibiting flu-like symptoms, to their family physician, Dr. Clem Forrest, who diagnosed the child as having a virus. Dr. Forrest prescribed Keflex (an antibiotic) and adult strength aspirin to help control the fever. That same day, Mrs. Sharkey purchased Bayer aspirin from Glascow's Thrift Town Pharmacy in Amite, Louisiana, and began to administer the medications pursuant to Dr. Forrest's instructions. Sherry ingested approximately four tablets of Bayer aspirin per day on October 6th, 7th and 8th, and showed a slight improvement of symptoms by the 8th. However, on October 9, 1981, Mrs. Sharkey noticed a sudden worsening of symptoms, and brought Sherry back to Dr. Forrest. The doctor prescribed Bactrim, a different antibiotic and Phergan VC with codeine. Sherry's condition continued deteriorating and she was admitted to Hood Memorial Hospital, in Amite, Louisiana, on October 10, 1981. On October 11, when the hospital staff at Hood Memorial was unable to rouse the child, she was transferred to the emergency room at Seventh Ward Hospital in Hammond, Louisiana, where she was seen by Dr. Rholdon. After performing a spinal tap, which ruled out the possibility of meningitis and encephalitis, Dr. Rholdon, suspecting a diagnosis of Reye's Syndrome, contacted Dr. Carlile at Ochsner Hospital in New Orleans. By October 12, 1981, Sherry was in a comatose state, and she was transferred to Ochsner Hospital where the diagnosis of Reye's Syndrome was confirmed. She remained hospitalized for approximately twenty-six days, and was then discharged back to her home with the Sharkeys, as a permanently retarded child, with an I.Q. of forty-two.
On August 27, 1987, Sherry's father committed suicide. On September 1, 1987, Mr. and Mrs. Sharkey were appointed Sherry's legal tutors. Three days later, on September 4, 1987, they filed this action on Sherry's behalf.

JURY TRIAL
Sterling maintains that the trial judge erroneously denied its request for a jury trial. The Sharkeys argue that this court's and the Supreme Court's pretrial denial of supervisory writs on the jury trial issue constitutes the law of the case, and precludes relitigation of that issue in this appeal. The "law of the case" principle embodies the rule that an appellate court ordinarily will not reconsider its own rulings of law in the same case. Glenwood Hospital, Inc. v. Louisiana Hospital Service, Inc., 419 So.2d 1269, 1271 (La.App. 1st Cir.1982). The doctrine is a discretionary guide and is not applicable in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur. See Landry v. Aetna Insurance Company, 442 So.2d 440 (La.1983); Glenwood, 419 So.2d at 1271. Although we find no palpable error or manifest injustice in the denial of a jury in this case, we are mindful of the fact that the right to a jury is fundamental and all doubts must be resolved in favor of its exercise. Block v. Fitts, 259 La. 555, 250 So.2d 738 (1971). Therefore, out of an abundance of caution, we will address the merits of Sterling's argument.
While the right to a trial by jury is fundamental, it must be timely requested. Boudreaux v. Total CATV, Inc., 536 So.2d 571 (La.App. 1st Cir.1988). LSA-C.C.P. *706 art. 1733 provides that a request for a trial by jury "shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury." If the request is not timely made, the right is waived; and the trial judge is vested with much discretion to disallow the filing of amended pleadings, if he finds that they are being filed solely for the purpose of circumventing the time limitations of LSA-C.C.P. art. 1733. Barberito v. Green, 275 So.2d 407 (La.1973); Scurria v. Madison Parish Police Jury, J.O., 566 So.2d 1077 (La.App. 2nd Cir.1990); Edwards v. Castille, 537 So.2d 880 (La.App. 3rd Cir.1989); see also LSA-C.C.P. art. 1151.
Sterling filed its first request for a jury on November 28, 1988. Also, on December 9, 1988, it asked for leave of court to file a supplemental answer in which it planned to assert a request for a jury trial. Both requests were denied by the trial court. Sterling took writs to this court (Docket No. CW 89-0072) and to the Supreme Court (Sharkey v. Sterling Drug, Inc., 536 So.2d 1259 (La.1989)). Both writs were denied.
Sterling argues that the time limitation imposed by LSA-C.C.P. art. 1733 had not commenced running prior to the dismissal of ABC, because until that moment in time, there remained to be filed a pleading "directed to an issue triable by jury," specifically, an answer by ABC, or the dismissal of ABC as a defendant in the lawsuit. Sterling maintains, therefore, that its jury trial request, filed on November 28, 1988, the tenth day after the dismissal of ABC[1] was timely.
The trial court, apparently finding incredulous Sterling's reliance on the potentiality of an answer being forthcoming by "ABC Insurance," concluded that the dismissal of that fictitious defendant did not mark the commencement of a new ten day period within which a timely jury request could be made. Since more than ten days had lapsed from service of the last pleading directed to an issue triable by jury, Sterling's request was untimely pursuant to the statute, and properly denied by the trial court.
Sterling further argues that the trial court erred in denying it the opportunity to file a supplemental answer in which Sterling intended to assert a jury trial request. The trial court made a finding of fact that the supplemental answer "adds nothing new to the pleadings as to triable issues of fact, and is filed solely for the purposes of circumventing the time limitations...," and denied Sterling leave to file the supplemental answer. After our review, we agree with the trial court; in any event, we find no abuse of the trial court's discretion.

THE PRODUCTS LIABILITY ACTION
This case is governed by the law of strict products liability as set out in Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986).[2]Halphen set out four theories of recovery available in products liability actions: (1) unreasonably dangerous per se; (2) unreasonably dangerous in construction; (3) unreasonably dangerous for failure to warn; and (4) unreasonably dangerous in design. Although the method of proof varies under the different theories, recovery under all four theories is predicated on proof of the same essential elements: (1) the product was unreasonably dangerous; (2) the resulting injury was caused by the product; and (3) the condition rendering the product unreasonably dangerous existed at the time the product left the manufacturer's control.[3] *707 See Halphen, supra, 484 So.2d at 113.
The Sharkeys claim that Sterling is liable to them and to Sherry Fugler under two of the Halphen theories: unreasonably dangerous per se and unreasonably dangerous due to a failure to warn. The trial court found that the plaintiffs met their burden of proof, and were entitled to recovery under both theories. Sterling Drug assigns error to the trial court's findings regarding the products liability action as follows: (1) the trial court erred in holding that Bayer aspirin is "unreasonably dangerous per se;" (2) Sterling's failure to change the label on Bayer aspirin in 1981 to warn of the association between aspirin and Reye's Syndrome did not render the product "unreasonably dangerous;" (3) the trial court erred in holding that Sterling's alleged breach of a duty to warn was the cause of Sherry Fugler's injury; (4) the trial court erred in holding that aspirin caused Sherry Fugler's specific case of Reye's Syndrome.[4]

Was Bayer Aspirin "Unreasonably Dangerous Per Se" in October, 1981?
A manufacturer's liability for harm caused by "unreasonably dangerous per se" products may be imposed solely on the basis of the intrinsic characteristics of a product irrespective of the manufacturer's intent, knowledge or conduct. Halphen, 484 So.2d at 113. "A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product ... outweighs the utility of the product." Halphen, 484 So.2d at 114.
In the instant case, the trial court applied the risk-utility test and found that the risks demonstrated through the epidemiological studies (discussed fully below) far outweigh the benefits (the reduction of fever in children) and concluded that "as to pediatric patients exhibiting [flu-like or chicken pox] symptoms ... aspirin is unreasonably dangerous per se...." We find that the trial court erred as a matter of law in limiting the risk-utility determination to a particular sub-class of consumer, or user. The proper application of the risk-utility test requires a weighing of the danger-in-fact of a product to society as a whole against the utility of the product to society as a whole, since the purpose of deeming a product unreasonably dangerous per se is the elimination of a product "too dangerous to be placed on the market." See Halphen, 484 So.2d at 118; see also Valenti v. Surgiteck-Flash Med. Eng. Corp., 875 F.2d 466 (5th Cir.1989). Furthermore, our Supreme Court has expressly clarified its intent not to allow such a limitation in the risk-utility analysis of a product. See Brown v. Sears, Roebuck and Company, 516 So.2d 1154 (La.1988).[5] This error of law does not require reversal of the trial court's judgment. As explained below, the trial court correctly found Sterling liable under another theory of recovery.

Was Bayer Aspirin Unreasonably Dangerous For Failure to Warn in October, 1981?
Under Halphen, a product may be unreasonably dangerous if the manufacturer fails to adequately warn about a danger related to the way the product is designed. 484 So.2d at 114. The manufacturer's duty to warn was established as follows:
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or *708 obvious to the ordinary user.... In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby.... A manufacturer also has a duty to inspect its product, and the extent of research and experiment must be commensurate with the dangers involved... (citations omitted.) Halphen, 484 So.2d at 115.
In determining that Sterling's failure to warn rendered Bayer aspirin unreasonably dangerous, the trial court found that in light of an established association between the use of aspirin in pediatric patients and the subsequent contraction of Reye's Syndrome, Sterling "knew or should have known that a product warning was needed as of [October, 1981]."
First described by the pathologist Douglas Reye of Australia, in 1963, Reye's Syndrome is classically described as occurring in a child or teenager during the course of or while recovering from a mild respiratory tract infection, flu, chicken pox, or other viral illness.... The disease is characterized by severe vomiting and irritability or lethargy, which may progress to delirium and coma. The illness is described clinically as having an acute onset in which the initial symptom is usually vomiting, which may be profuse and persistent, and which is accompanied by a change in mental status.[6]
Plaintiffs introduced into evidence numerous publications to show the state of medical knowledge in 1981 regarding aspirin and Reye's Syndrome, and to establish that Sterling had a legal duty to warn the public of the potential dangers of Bayer aspirin as early as 1981.
In 1964, an article entitled "`White Liver' Disease," by H.L. Utian, et al., was published in The Lancet, a British Medical Journal. This article reported on a "striking and characteristic syndrome" observed since 1955, in pediatric patients in South Africa. The article described a disease with symptoms very similar to Reye's Syndrome. Several of the patients had received salicylate (an ingredient of aspirin) prior to admission to the hospital, and in those cases, the salicylate was considered as a possible cause of the disease.
On May 15, 1965, The Lancet published a letter by physician, Dr. Giles, who had studied nine Reye's Syndrome cases and concluded that a causal connection between Reye's Syndrome and aspirin was possible.[7] Dr. Giles urged that a careful and determined investigation into the use of aspirin was warranted, and should be undertaken.
In 1974, a book entitled Reye's Syndrome was published by Grune and Stratton, Columbus, Ohio, which contains studies of Reye's Syndrome, some of which show an association between aspirin and the disease.
In July, 1974, an article entitled "Association of Reye's Syndrome With Viral Infection" was published in The Lancet which studied twenty-four diagnosed cases of Reye's Syndrome in Cincinnati, Ohio and reported that all twenty-four patients had received aspirin or aspirin-containing compounds during their illness.
In 1975, an article entitled "Reye's Syndrome: Epidemiologic and Viral Studies, 1963-1974" by C.C. Linnemann, Jr., et al., published in American Journal of Epidemiology reported on fifty-eight cases of Reye's Syndrome that were treated at the University of Cincinnati between 1963 and 1974. The article noted that fifty-three of the patients had taken salicylates prior to hospitalization.
In 1976, an article entitled "Reye's Syndrome," by G.M. Schiff, published in Annual Review of Medicine mentions that "[a]spirin has been suspected as playing a prominent role in the disease dynamics, as most patients receive some form of aspirin *709 during [the viral illness preceding Reye's Syndrome]."
In March, 1976, an article entitled "Acute Encephalopathy in SiblingsReye's Syndrome vs Salicylate Intoxication," by R.G. Rosenfeld and M.I. Liebhaber was published in American Journal of the Diseases of Children. This article studies cases of Reye's Syndrome in siblings and notes that "the possible association of Reye syndrome with elevated serum salicylate levels has been the subject of much debate."
In the November-December, 1976 publication of FDA Drug Bulletin, the U.S. Food and Drug Administration issued the findings of its neurologic drugs advisory committee and advised against the use of aspirin in children who develop vomiting associated with a viral illness based on the committee's conclusion that "... the possibility remains, although unproven, that [aspirin] adversely affect[s] the course of the disease."
In 1977, an article entitled "Diagnostic Criteria for Influenza B-Associated Reye's Syndrome: Clinical vs. Pathologic Criteria" was published in Pediatrics. This article contained studies of 379 Reye's Syndrome cases reported to the Center for Disease Control (CDC), in Atlanta, Georgia in 1973 and 1974. Detailed data regarding the use of aspirin were available on 175 of the cases, and although "no relationship between outcome and the receipt of aspirin was demonstrated," it was noted that 136 of 175 of the patients studied were given aspirin prior to hospitalization.
In July, 1980, CDC publication, Morbidity and Mortality Weekly Report, (MMWR), stated that "[a]spirin is one medication that has been mentioned frequently as a possible contributing factor in the pathogenesis of Reye syndrome although it has been reported that aspirin toxicity and Reye syndrome may be differentiated on the basis of serum amino acid patterns...."
In November, 1980, the Michigan State Department of Health issued a press release indicating that recent studies conducted by the state health departments in Arizona, Michigan and Ohio had demonstrated an association between the use of aspirin and the occurrence of Reye's Syndrome. Based on these showings, the press release states: "Even though final proof is lacking that taking aspirin increases the likelihood of the occurrence of this disease, withholding aspirin-containing products when they are not really needed to protect the health of the child seems reasonable and prudent until the evidence is in."
On November 7, 1980, the CDC published summaries of the Arizona, Michigan and Ohio Department of Health studies in the MMWR. The MMWR reported: "The results of these studies suggest that during certain viral illnesses the use of salicylateseven before the onset of vomiting may be a factor in the pathogenesis of Reye Syndrome ..." and advised caution in the use of aspirin to treat viral illnesses in children.[8]
In addition to these publications, testimony from various expert witnesses on behalf of both sides confirmed that there was general medical knowledge, in 1981, of a reported association between the ingestion of aspirin by pediatric patients and the subsequent contraction of Reye's Syndrome. These experts' testimony differed in only one respect: the plaintiffs' experts (Drs. Noel Weiss and Sylvia Micik) opined that the reported association supported a belief that aspirin was causally connected to Reye's Syndrome, while the defendants' experts (Drs. James Orlowski, Doris Trauner and Kenneth McCrae) discounted the significance of the reported association and opined that a causal connection between aspirin and Reye's Syndrome had not been demonstrated by the reported association. However, none of the experts denied that, in 1981, the state of medical knowledge included an awareness of the possibility that aspirin use was causally connected to Reye's Syndrome.
*710 The plaintiffs also introduced into evidence numerous interoffice memorandums and communications obtained from Sterling Drug, Inc. and Glenbrook Laboratories (the division of Sterling Drugs, Inc. which manufactures and sells Bayer aspirin), to establish specifically that Sterling had actual knowledge of the reported association prior to October, 1981.
In addition, Dr. Monroe Trout, medical director of Sterling Drug, Inc. testified that he was aware of a reported association between aspirin and Reye's Syndrome in October, 1980, by way of an interoffice memorandum, and again in November, 1980, with the MMWR publication of the state studies. Dr. William Soller, director of scientific affairs at Glenbrook Laboratories in 1981, testified that he was aware of a reported "possible association or possible link" between aspirin and Reye's Syndrome by way of the 1976 FDA Drug Bulletin.
Both Soller and Trout testified that Sterling first commenced its own investigation into the reported relationship between aspirin and Reye's Syndrome shortly after the MMWR publication of November 7, 1980. Both men were questioned extensively on direct and cross examination regarding the specific actions taken by Sterling with regard to the investigation. Trout testified that Sterling first placed warnings on its aspirin bottles in 1985, after a request by the secretary of the U.S. Department of Health and Human Services for voluntary action by the manufacturers of aspirin.
In its reasons for judgment, the trial court stated: "This Court's assessment of Sterling's response to this information was that, rather than `testing and inspecting' its product, Sterling did all it could to discredit these studies and reports on the alleged basis of science." There is ample evidence in the record to support this conclusion. Among this evidence is the testimony of Dr. Harry Jennisen, former executive director of the American Academy of Pediatrics (AAP), regarding the AAP's involvement in investigating the reported association. This testimony included references to communications between Jennisen and Soller during the height of the controversy of whether a labeling change on aspirin bottles was warranted. This evidence suggests that Sterling's actions were influential in the decisions made by the AAP to withhold a recommendation for mandatory warnings until further studies were conducted. The most significant piece of evidence, which alone, supports the trial court's assessment of Sterling's actions is a "Dear Doctor" letter circulated by Glenbrook Laboratories to physicians nationwide, dated March 10, 1981. In this letter, Sterling makes the following statements, in light of the MMWR's reported association between aspirin and Reye's Syndrome:
(1) The cause of Reye's Syndrome is unknown.
(2) Aspirin has not been shown to be a cause of Reye's Syndrome. (emphasis in original).
(3) The retrospective studies on Reye's Syndrome may have been tainted by a number of confounding factors including:
poor selection of controls
poor data gathering
the expected greater use of aspirin by sicker children
(4) Since the studies leave many questions unanswered more are needed that are carefully designed.
(5) Data from future studies must be available before recommending changes in the current practices of antipyretic therapy of children. (Emphasis supplied.)
. . . . .
In summary, there is no hard evidence for a cause and effect link between aspirin use and Reye's Syndrome. Further, there is evidence (see above) that this link may in fact be spurious and that the disease can occur with antipyretic medications other than aspirin.
We observe that this letter not only did not constitute a warning, but appears to have been designed to have the opposite effect.
*711 In assessing Sterling's actions, the trial court further stated: "The more responsible course, given the high percentage shown by the statistics at the time, and the terrible consequences of Reye's Syndrome, would have been to immediately warn the public, at least as to the possible association." The trial court's conclusion that Sterling had a duty to warn and that it breached this duty is amply supported by the record; in any event, it is not manifestly erroneous. See Wallace v. Upjohn Company, 535 So.2d 1110, 1116 (La.App. 1st Cir.), cert. denied, 539 So.2d 630 (La. 1988).

Was Sterling's Breach of its Duty to Warn the Legal Cause of Sherry Fugler's Injuries?
An essential element of a cause of action based on failure to adequately warn of a product's danger is that there be some reasonable connection between the omission of the manufacturer and the damage which the plaintiff has suffered. Ingram v. Caterpillar Machinery Corporation, 535 So.2d 723, 729 (La.1988). This cause in fact burden is assisted by a presumption that, if warnings had been provided, the user would have heeded such admonitions. The presumption may be rebutted if the manufacturer produces contrary evidence which persuades the trier of fact that an adequate warning or instruction would have been futile under the circumstances. Bloxom v. Bloxom, 512 So.2d 839, 850 (La.1987).
Sterling argues that its alleged breach of a duty to warn Mrs. Sharkey was not a cause-in-fact of Sherry Fugler's injuries. Sterling claims that the evidence adduced at trial was sufficient to establish that an adequate label on aspirin bottles would have been futile under the circumstances of this case. Further, Sterling argues that it was relieved of its duty to warn, since Dr. Forrest, the physician who prescribed the aspirin for Sherry Fugler, admitted that he had knowledge of the reported danger, yet failed to warn Mrs. Sharkey. These arguments are meritless.
Mrs. Sharkey testified at trial that she, as a general rule, did not read labels on medications, and instead relied on the expertise of the doctors in whom she placed great confidence. Specifically, she admitted that she did not know whether there was a warning on the Bayer aspirin bottle she purchased in October, 1981, because she did not look at the label. Sterling maintains that this evidence is sufficient to rebut the presumption that a warning label would have been effective. Sterling's argument completely ignores the testimony of Dr. Clem Forrest, the physician who prescribed the aspirin for Sherry. Dr. Forrest testified unequivocally that had there been a warning against the use of aspirin in children, he would not have advised Mrs. Sharkey to give Sherry aspirin. In fact, he further testified that he discontinued prescribing aspirin for children in the face of the contradictory warning labels subsequently placed on aspirin bottles.[9] Mrs. Sharkey's testimony firmly established that she always did exactly what a doctor advised her to do. The inescapable conclusion is that if a warning had been in place, Dr. Forrest would not have prescribed the aspirin, and absent this advice, Mrs. Sharkey would not have given Sherry aspirin. Thus, the trial court did not err in concluding that Sterling's failure to warn was the legal cause of Sherry Fugler's ingestion of aspirin and subsequent contraction of Reye's Syndrome.

Was Aspirin the Legal Cause of Sherry Fugler's Specific Case of Reye's Syndrome?
For purposes of this appeal, Sterling has conceded that Sherry Fugler has Reye's Syndrome. The thrust of defendant's argument is that the plaintiffs failed to prove a causal link between the ingestion of Bayer *712 aspirin by Sherry Fugler and her subsequent Reye's Syndrome.
It is well settled that for a plaintiff to succeed in a tort action, he must prove all the essential elements of his claim by a preponderance of the evidence. Wisner v. Illinois Central Gulf Railroad, 537 So.2d 740, 745 (La.App. 1st Cir.), cert. denied, 540 So.2d 342 (La.1989). In cases where medical causation is at issue, medical certainty is not the standard. Our courts have recognized that "medicine is an inexact science at best, but in the courts of law we must be concerned not with concrete and irrefutable truths, but rather the proper distribution of liability based on the preponderance of the evidence." Howell v. Iacona, 505 So.2d 821, 828 (La.App. 2nd Cir.1987). See also Creel v. S.A. Tarver & Son Tractor Co., Inc., 537 So.2d 752, 754 (La.App. 1st Cir.1988); Gianechini v. City of New Orleans, 410 So.2d 292, 300 (La. App. 4th Cir.), cert. denied, 412 So.2d 1109 (La.1982); Rhoto v. Ribando, 504 So.2d 1119 (La.App. 5th Cir.), cert. denied, 506 So.2d 1225 (La.1987).
In Wisner, 537 So.2d at 745, we further noted:
It is not unusual for medical experts to be unwilling to state unequivocally the cause of a certain malady. Likewise, we do not require they do so, but only to provide their considered medical opinion on key issues from which the trier of fact makes its own determinations.
Sterling relies heavily on the fact that none of the experts at trial was able to state unequivocally, that (Bayer) aspirin caused Sherry Fugler's Reye's Syndrome, and contends that the trial court erred in finding that the plaintiffs met their burden of proof regarding causation. As we have stated above, proof of causation to a medical certainty is not required. Indeed, even to date, there exists no unequivocal proof by scientific standards that aspirin causes Reye's Syndrome. Therefore, proof of causation in this case rests largely on epidemiological or statistical studies. Proof of causation, based in part on epidemiological studies as the basis for expert opinion has been allowed in our courts. See Toups v. Sears Roebuck & Company, Inc., 507 So.2d 809 (La.1987).
As noted by the trial court, the evidence in this case showed at least seven case-controlled studies which indicated a high degree (over ninety percent) of association between ingested aspirin and Reye's Syndrome. Sterling's experts took exception to the methodology of these studies, in particular, citing numerous potential biases that may have skewed the results of those studies. In response to Sterling's contentions of possible bias in the original studies, plaintiffs introduced a document entitled "Special Report: Aspirin & Reye's Syndrome," an official report of the Committee on Infectious Disease of the AAP, based on the report of the Reye Syndrome Working Group convened by the Centers for Disease Control, published in Pediatrics, in June, 1982. In preparing the report, the committee examined the full reports of the studies which had been published in November, 1980, and looked for the systematic biases that might have created an apparent causative association between aspirin and Reye's Syndrome when, in fact, such did not exist. The committee concluded, in pertinent part: "As you are well aware, an epidemiologic association does not prove causation. However, causation may be strongly indicated by association when no other explanation for the relationship is found.... [I]t is very unlikely that [the potential biases] explain the association observed. Thus, the consensus of the Committee is that there is a high probability that the administration of aspirin contributes to the causation of Reye Syndrome." The committee also noted: "... there is no reasonable likelihood that these results are a consequence of chance alone."
Following the MMWR publication of state studies in 1980, further epidemiologic studies continued to confirm the reported association, and a high relative risk (percentage of Reye's Syndrome patients that had taken aspirin) was, once again, indicated. A public health service study was conducted between 1985 and 1986, by the Public Health Service Reye Syndrome Task Force, consisting of members from the *713 Centers for Disease Control, U.S. Food and Drug Administration, the National Institutes of Health, and the Office of the Assistant Secretary of Health, U.S. Department of Health and Human Services. The results of the main study were reported in an article entitled "Public Health Service Study of Reye's Syndrome and Medications," published in the Journal of the American Medical Association (JAMA), in 1987. This report concludes:
From a public health standpoint, the substantial exposure rate in controls and the high odds ratios observed in this study suggest not only a strong association between Reye's Syndrome and salicylates (and specifically aspirin), but also that a large portion (>90% assuming an odds ratio of 40) of Reye's Syndrome cases may be attributable to salicylates.
In 1989, an article entitled "New Epidemiologic Evidence Confirming That Bias Does Not Explain the Aspirin/Reye's Syndrome Association" was published in JAMA and reported the results of a case-control study conducted primarily by the Yale University School of Medicine ("Yale Study"), which was undertaken due to "persistent concerns about potential bias" in the former studies. This study enumerated five sources of potential bias that had not been addressed fully in earlier studies, and concluded: "The results of this study confirm the strong associations between Reye's Syndrome and exposure to aspirin reported in the other studies."
The findings of these studies were not refuted by the testimony of experts. Again, Sterling's experts attempted to discredit the significance of the findings, while the plaintiffs' experts testified that these studies produced highly convincing evidence that there is likely a causal relationship between aspirin and Reye's Syndrome. In Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200, 1203-04 (La.App. 1st Cir.1982), cert. denied, 429 So.2d 133 (La.1983), we stated the following regarding the evaluation of expert testimony:
The finder of fact, be it judge or jury, should assess the credibility of witnesses, expert or lay, to determine the most credible and realistic evidence.... The fact finder's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong.
In addition to the epidemiologic studies, the plaintiffs offered testimony regarding Sherry Fugler's viral symptoms, intake of aspirin, and resulting Reye's Syndrome symptoms; this evidence further supports the trial court's finding. We have reviewed the entire record and we find no manifest error in the trial court's conclusion that the evidence established more probably than not that Sherry Fugler's ingestion of aspirin caused her Reye's Syndrome.

PRESCRIPTION
The defendants argue that the Sharkey's claim, filed almost six years after Sherry contracted Reye's Syndrome had prescribed. Although the prescriptive period applicable to product liability cases is one year from the date damages are sustained (see LSA-C.C. art. 3492), our jurisprudence adopts the doctrine of contra non valentem to the effect that prescription does not commence running until the facts necessary to state a cause of action are known or reasonably knowable to the plaintiff. The doctrine is consistently applied to cases in which allegations of medical causation are vital to the cause of action. In such cases, even if a plaintiff is aware that an undesirable condition developed at some point in time after medical treatment, prescription does not run until the plaintiff has actual or constructive notice of the causal connection between the medical treatment and the subsequent condition. See Griffin v. Kinberger, 507 So.2d 821, 823-24 (La. 1987); Zumo v. R.T. Vanderbilt Company, Inc., 527 So.2d 1074, 1077 (La.App. 1st Cir. 1988); Knaps v. B & B Chemical Company, Inc., 828 F.2d 1138 (5th Cir.1987).
Once a plaintiff properly invokes the doctrine of contra non valentem in defense to a claim of prescription, the defendant must prove that prescription commenced running more than one year prior to the filing of the suit by showing either *714 that the plaintiff had actual or constructive notice of the tortious act, the resulting injury, and the causal connection between the two (Zumo, 527 So.2d at 1077), or that the plaintiff's lack of such knowledge was willful, negligent or unreasonable. Young v. Clement, 367 So.2d 828 (La.1979).
The test for what constitutes notice sufficient to mark the commencement of prescription, enounced in Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970)[10], has been substantially modified by recent jurisprudence, and is stated as follows in Jordan v. Employee Transfer Corporation, 509 So.2d 420 (La. 1987):
Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage. On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury. When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction. 509 So.2d at 423.
We note at the outset, as did the trial court, that Sterling's contention that this action has prescribed is greatly undermined by its own contention that the cause of Reye's Syndrome is unknown. If the cause is unknown for purposes of Sterling's liability, then Sterling can hardly argue that the cause was known to the Sharkeys more than one year prior to their filing this action.
Both Mr. and Mrs. Sharkey testified at trial about their knowledge of the facts regarding their cause of action against anyone to whom fault might be attributable for causing their granddaughter's disease. Both testified that, even as of the trial date, they had been advised by all of Sherry's treating physicians that Sherry had Reye's Syndrome, and that the cause of that disease is unknown. Mr. Sharkey testified that sometime in April, 1987, he heard a radio talk show in which a doctor stated that the cause of Reye's Syndrome was aspirin. The next morning, when he reported to work, he saw a newspaper article about Reye's Syndrome which also suggested aspirin as the cause. According to Mr. Sharkey, he immediately sought the advice of a lawyer (his trial counsel, Mr. Simpson), and after this consultation, talked with his wife about Sherry's ingestion of aspirin prior to her contraction of Reye's Syndrome in October, 1981. Mr. Sharkey testified that, prior to hearing the radio talk show, he believed that the cause of Sherry's disease was unknown, as told to him by the physicians. When questioned regarding conversations with his wife, and actions taken by them to try to determine the cause of the Reye's Syndrome, Mr. Sharkey responded: "Well, I had taken it like polio. They tell you poliothey had poliothere's nothing you can do and when they told me it was Reye's Syndrome, I forgot about it that there was nothing I could dounknown."
Mrs. Sharkey likewise testified that before Mr. Sharkey approached her after hearing the talk show in April, 1987, she had never questioned the cause of her granddaughter's disease because she had been told by all of the treating physicians that the cause of Reye's Syndrome was unknown. Mrs. Sharkey was questioned about a file she had kept over the years in which she kept newspaper and magazine clippings regarding Reye's Syndrome. She stated that she had tried to keep up with the literature regarding Reye's Syndrome in order that she might learn more about the disease and how she could help Sherry overcome her disabilities. Although she did keep the news clippings, she testified that she merely had time to cut them out and file them away, as she was too busy *715 trying to care for her grandchildren and did not have time to read. The trial court concluded that under the circumstances, the Sharkeys' actions were reasonable. This finding is not clearly wrong. Further, a review of the articles kept by Mrs. Sharkey reveals that they do not set forth any conclusive statements regarding the cause of the disease, and instead, further confirmed what Mrs. Sharkey had been told by her physicians: that the cause of Reye's Syndrome is unknown.
The trial court found that the Sharkeys filed suit within one year of their actual knowledge regarding a possible causal connection between aspirin and Sherry's illness. The trial court also found that Sterling failed to prove that the Sharkey's knew or should have known, prior to hearing the radio talk show in 1987, that the manufacturer of Bayer aspirin might be liable to them for Sherry's injuries, or that the Sharkeys' actions were unreasonable.[11] We have reviewed the record entirely, and find no manifest error in the trial court's conclusion that this action had not prescribed. Accordingly, this ruling by the trial court is affirmed.

GLASCOW'S LIABILITY
The Sharkeys answered this appeal, and assign error to the trial court's dismissal of their claim against the pharmacist, Glascow. Noting an absence in the record of any evidence that the pharmacist had any knowledge of Mrs. Sharkey's intended use of the adult strength aspirin (which was purchased over the counter), the trial court concluded that Glascow had no duty under the facts of this specific case to warn Mrs. Sharkey about the association between aspirin and Reye's Syndrome.
We need not reach the merits of plaintiffs' arguments regarding the liability of pharmacists. Even assuming, arguendo, that Glascow had a duty to warn Mrs. Sharkey, and assuming that this duty was in fact breached, the plaintiffs have failed to prove that the pharmacist's alleged failure to warn was a legal cause of Sherry Fugler's Reye's Syndrome. As we discussed earlier, the evidence established that Mrs. Sharkey placed total reliance on the advice given to her by doctors regarding her administration of medications. This evidence sufficiently rebuts the presumption that a warning from the pharmacist would have prevented the ingestion of Bayer aspirin by Sherry Fugler. Dr. Forrest had prescribed adult strength aspirin, and as Mrs. Sharkey testified: "He was the doctor and I was doing what he told me." The trial court apparently found the testimony of Mrs. Sharkey to be credible, and we find no manifest error in his ruling. Therefore, we affirm the trial court's dismissal of plaintiffs' claim against Glascow.

QUANTUM

General Damages
The trial court awarded four million dollars in general damages, and Sterling argues that this award was an abuse of discretion.
The evidence in this record regarding Sherry Fugler's injuries consisted of the testimony of Mr. and Mrs. Sharkey, as well as the following expert testimony: Dr. Mollie Alarcon, who performed a special education evaluation; Rhonda Kelley, who performed a speech and language evaluation; Dr. Carmela Tardo, who performed a neurological evaluation, and psychologist, Pamela Hoblit, who performed a cognitive evaluation. The trial court made the following factual findings regarding Sherry's injuries, which we find are amply supported by the evidence:

*716 The evidence indicated that Sherry Fugler had been a normal five-year old until the onset of Reyes Syndrome. This resulted in brain damage to her. During the course of the disease, she lost consciousness, chewed through her lips and broke several of her teeth. In addition to the hospitalization at Hood and Seventh Ward, she was in intensive care at Ochsner for nine days and stayed at the hospital a total of twenty-six days.
She presently is classified as moderately mentally retarded, having a mental age of five-six years old (sic) and an I.Q. in the forties as of her evaluation at approximately age twelve. The motor functions and coordination in her body were likewise assessed at being below six years of age. Her speech is largely unintelligible, and she will never be able to read beyond a very primitive level. Her overall changes (sic) for improvement will be very limited, and very slight. She does not have good control of her toilet habits. She will have to have some supervision through the rest of her life, and, under the best of the circumstances, could only function in a small group home. However, there is not (sic) evidence that her life expectancy will be diminished.
Under the circumstances, the Court is faced with a young girl who was, to (sic) all intents and purposes, totally normal prior to the onset of Reyes (sic) Syndrome. She will go through the rest of her life as a mental retardate with significantly impaired physical functions.
When a reviewing Court considers whether a trial court abused its discretion in setting quantum, the question is not whether a different award might have been more appropriate, but whether the award can be reasonably supported by the evidence. Only after articulated analysis of the facts discloses an abuse of discretion, is a resort to prior awards appropriate for purposes of then determining what an appropriate award would be. See Reck v. Stevens, 373 So.2d 498 (La.1979).
We agree with the trial court's factual findings regarding the serious nature of Sherry's disabilities. We note also that, contrary to Sterling's contentions, the record reflects that Sherry suffers emotional pain associated with her loss. Mrs. Sharkey testified: "She cannot play with other children because she has gotten old enoughI mean other children her age, because she has gotten old enough that she realizes that she is not like a normal child and it is bothering her." Although Sherry suffers physical disabilities associated with her impaired mental status, there is little evidence of any physical pain associated with her disabilities. Despite the serious and permanent loss suffered by Sherry Fugler as a result of her Reye's Syndrome, we find that an award of four million dollars for her general damages is excessive. We look to recent cases with similar facts and circumstances to determine an appropriate award.
The case with the most factually similar injury is Marcel v. Louisiana State Department of Public Health, 492 So.2d 103 (La.App. 1st Cir.), cert. denied, 494 So.2d 334 (La.1986). In that case, a general damage award of one million dollars was adjudicated to the father (plaintiff) of a child who suffered mental retardation (IQ of 48) and physical disabilities because of the defendant's failure to diagnose the child's phenylketonuria. We affirmed that award, finding it was within the trial court's discretion. In Johnson v. Kansas City Southern Railway, 531 So.2d 773 (La.App. 3rd Cir.), cert. denied, 534 So.2d 445 (La. 1988), the plaintiff suffered a massive head injury in a collision with a train, which resulted in organic brain syndrome. In addition to his neurologic injuries, the plaintiff also suffered severe physical injuries and is a "permanent quadriparetic" meaning that he has weakness in all of his extremities. The court found that the jury's general damages award of $280,500 was an abuse of discretion and raised the award to the lowest award which the jury could have reasonably awarded, or two million dollars. In Mullet v. State of Louisiana through the Department of Transportation and Development, 539 So.2d 897 (La.App. 4th Cir.), cert denied, 541 So.2d 1390 (La.1989), the plaintiff was involved in *717 a motorcycle accident in which he suffered a closed head injury which resulted in mental disabilities, as well as physical injuries and partial paraplegia. The court held that a general damages award of three million dollars was not an abuse of discretion; however, the award was reduced to the statutory maximum recovery against the state of $500,000.
Having found an abuse of discretion in the four million dollar general damages award, we now lower the award to the "highest point which was reasonably within the discretion afforded to the trial court" (See Coco v. Winston Industries, Inc., 341 So.2d 332 (La, 1976). We find, based on our review of the pertinent jurisprudence and the facts and circumstances of this case, that two and one-half million dollars is the highest amount which the trial court could have reasonably awarded. Accordingly, the general damages award is modified to this extent.

Special Damages
It is undisputed that Sherry will need twenty-four hour supervised care for the remainder of her life; the record established her life expectancy is 66.21 years.
Robert Voogt, Ph.D., rehabilitation counselor, prepared a "Life Care Plan" which enumerated the items Sherry would need for her future care, and testified regarding the unit cost and frequency for each item. The total costs of these items was calculated to present value by economist, Randolph Rice, Ph.D.
Voogt presented two options regarding Sherry's future care. The first option provided for future attendant care at a long-term care facility. Using the average per day cost from the option presented by Voogt, Dr. Rice calculated the present value cost for this option to be $5,416,806. Sterling did not refute the estimated cost of a long term care facility, nor did it present any evidence regarding an alternative facility available to Sherry at a lower cost. Sterling merely argues that the type and quality of the facilities presented as options at trial were not necessary for Sherry, and that if such care were deemed necessary, state facilities could provide the care needed at a lower cost. Voogt testified that he would not recommend "state" facilities for Sherry because they lack the funding as well as the quality of care which he estimates Sherry will need.
The second option provides for services Sherry would need assuming she is kept in a private home environment. These services consist of post-acute pediatric rehabilitation (for an estimated five months); behavior specialist, recreational therapy and cognitive remediation (until the age of twenty-two); occupational, speech and physical therapy; rehabilitation equipment; private school; a case manager and attendant care and companion care for when Sherry is not in school, and medical evaluations, medical treatment, and therapeutic evaluations. Dr. Rice calculated the present value for the cost of these services at $4,555,427. The most costly of these items is the attendant and companion care. Voogt testified that Sherry would need a skilled attendant for eight to twelve hours a day, at a cost of $8.50 per hour, and companion care or a "professional sitter" for the remaining twelve to sixteen hours a day, at $6.00 per hour. Using the figures of ten and fourteen (the mid-range for hours per day), Dr. Rice calculated the present value for the total cost of supervised care at $4,084,164. In performing his calculations, Dr. Rice testified that he used the "total offset" method (applying a net discount factor) to consider inflation. He also testified that the cost of health care is expected to increase at a faster rate than general inflation, and he calculated the present value of the health care items in Sherry's plan accordingly. Sterling's economist expert, Dr. Long, agreed with Dr. Rice that the cost of health care will inflate at a rate of 3% faster than general inflation. However, the two experts disagreed on the classification of the most costly item in the plan, the attendant and companion care. Dr. Rice testified that these services are included in the "health care" that is expected to inflate at a higher rate, while Dr. Long opined that these services are not the type of "professional health care" services to which the higher inflation rate is applicable. *718 According to Dr. Long's calculations, the present value of the services presented by Dr. Voogt is $1,456,064.a difference of over two and a half million dollars from Dr. Rice's calculations for the same services.
After hearing the testimony and evidence presented, the trial court obviously believed the testimony of Dr. Rice, that the services included in Sherry's home care will be subject to the higher "health care" inflation rate. We have thoroughly reviewed this evidence, and find no clear error in the trial court's findings. The "total offset" method for calculating projected inflation has been approved by this court. See Schwamb v. Delta Air Lines, Inc., 516 So.2d 452, 465 (La.App. 1st. Cir.1987), cert. denied, 520 So.2d 750 (La. 1988). Further, as we pointed out earlier, the fact finder should assess the credibility of expert witnesses, and determine the most credible and realistic evidence. Absent manifest error, this evaluation will not be disturbed. See Holmes, 422 So.2d at 1203-04. The trial court was presented with two options for Sherry Fugler's future care, prepared by a rehabilitation expert. The cost of the long-term institutionalized care was calculated by Dr. Rice to be $5,416,806. The cost of the health care services Sherry will need if she is kept in a home environment was calculated by Dr. Rice to be $4,555,427. The only evidence offered by Sterling to refute these calculations was the testimony of its expert, Dr. Long, who differed in opinion from Dr. Rice regarding the calculation of the inflation rates for these items. Obviously, the trial court chose to believe Dr. Rice. Based on the two options presented, the trial court awarded five million dollars for Sherry's future care, a mid-range award between the two options presented. After our review of the record, we find the judgment of the trial court is supported by the record. The evidence established that Sherry might be able to stay at home for a while, but due to the age and declining health of her grandparents, and the absence of other relatives to care for her, it is likely that she will in the future require sustained institutional care. The mid-range amount awarded by the trial court is reasonably supported by the record, and is not manifestly wrong.
The trial court also awarded $300,000 for Sherry's future loss of earning capacity and $24,964.31 for past medical expenses. These awards are not contested by Sterling and are accordingly affirmed.

Prejudgment Interest on Future Damages
Sterling argues that the interest on damages for future losses should run from the date of judgment, and assigns error to the trial court's award of interest on all damages from the date of judicial demand. Although Sterling's argument is persuasive, and might perhaps be addressed to the legislature, we find no error in the trial court's judgment. See LSA-R.S. 13:4203; Schwamb, 516 So.2d at 467.

Attorney's Fees
The Sharkeys, in their answer to this appeal, assert a claim for an award for attorney's fees which was denied by the trial court. We have held that, in products liability cases, where liability is based on the manufacturer's breach of a duty to warn, an award for attorney's fees is improper. Walker v. Maybelline Co., 477 So.2d 1136, 1140 (La.App. 1st Cir.1985), cert. denied, 481 So.2d 1333 (La.1986). Therefore, the trial court did not err in denying an award for attorney's fees.
Finally, Sterling points out a technical error in the trial court's judgment. The trial court incorrectly rendered judgment in favor of the Sharkeys, individually, and as legal tutor and undertutrix. (emphasis added). We amend the judgment to reflect that the judgment is rendered in favor of Sherry Fugler, through her tutor and undertutrix, Mr. and Mrs. Sharkey.
For the foregoing reasons, we alter the language of the award, and we lower the general damages award to two and one-half million dollars; the judgment of the trial court is, in all other respects, affirmed. Costs of this appeal are assessed to defendant, Sterling Drug, Inc.
*719 AMENDED, AS AMENDED, AFFIRMED.
LOTTINGER, J., concurs and dissents and assigns written reasons.
LOTTINGER, Judge, concurring in part and dissenting in part.
I agree with the majority in the reduction of the general damage award and the affirmance of the trial court judgment in all other respects. However, I would reduce the general damage award to the sum of $2,000,000.00.
Therefore, I concur in part and dissent in part.
NOTES
[1] The 10th day after the dismissal of ABC Insurance Company was November 24, 1988, which was Thanksgiving, and the court remained closed throughout the weekend. Therefore, according to Sterling, the ten day time limitation imposed by LSA-C.C.P. art. 1733 lapsed on November 28, 1988, the day on which it filed its request.
[2] The Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., effective September 1, 1988, is nonretroactive and inapplicable to this action. See Gilboy v. American Tobacco Company, 582 So.2d 1263 (La.1991).
[3] No issue has been raised regarding the third element of proof; apparently the parties concede that the Bayer aspirin ingested by Sherry Fugler was the same product which left Sterling's control.
[4] In brief, Sterling concedes that Sherry Fugler was given aspirin, that the aspirin she ingested was Bayer, and that Sherry Fugler had Reye's Syndrome.
[5] We are not persuaded by the holding in Antley v. Yamaha Motor Corporation, U.S.A., 539 So.2d 696 (La.App. 3rd Cir.1989) that a "Yamaha ATV 225 is unreasonably dangerous to small children," since such a holding is contrary to the cautionary statements by the Supreme Court in Brown, 516 So.2d at 1154.
[6] 50 Federal Register 51400.
[7] The record reflects that Plaintiff Exhibit 49, the Dr. Giles letter, was introduced into the record at trial. We have been unable to locate this exhibit in the record. However, neither the letter's publication nor its contents are in dispute.
[8] The results of the Arizona study were also published in Pediatrics, in December, 1980, in an article entitled "Reye's Syndrome and Salicylate Use," by K.M. Starko et al.
[9] We note that each practicing physician who testified at trial (Drs. Forrest, St. Germain, Rholdon, Tardo, Carlile and Sanders) stated that he no longer prescribes aspirin for children with viral symptoms in the face of the warnings now placed on aspirin bottles, mandated by the FDA in 1986, which read: WARNING: Children and teen-agers should not use this medicine for chicken pox or flu-like symptoms before a doctor is consulted about Reye's Syndrome, a rare but serious illness reported to be associated with aspirin.
[10] In Cartwright, 232 So.2d at 287, the test was formulated as follows:

Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription.
[11] Prior to his death in August, 1987, Robert Fugler, the child's father, was the person with legal capacity to sue on her behalf. See LSA-C.C. art. 250. Based on the evidence presented at trial, the trial court found that Mr. Fugler did not have actual knowledge of the elements of a cause of action on Sherry's behalf at any time prior to his death. Further, having found that the Sharkeys did not have constructive knowledge for more than one year prior to the filing of this suit, the trial court apparently inferred that Robert Fugler did not possess such knowledge either. Based on the evidence in the record, we find that this was a reasonable inference. In any event, this is a finding of fact which we will not disturb in the absence of manifest error. See Rosell v. Esco, 549 So.2d 840, 844 (La.1989).