504 So.2d 1119 (1987)
Jerry and Judy RHOTO
v.
R.T. RIBANDO, M.D., and ABC Insurance Company.
No. 86-CA-627.
Court of Appeal of Louisiana, Fifth Circuit.
March 16, 1987.
Writ Denied May 29, 1987.
Louis H. Schultz, Thomas Cerullo, Metairie, for plaintiffs-appellants, Jerry and Judy Rhoto.
*1120 Robert W. Sparks, Lisa M. Tompkins, Adams and Reese, New Orleans, for defendant-appellee, Ortho Pharmaceuticals, Inc.
S. Gene Fendler, Julie E. Schwartz, Liskow & Lewis, New Orleans, for defendant-appellee, SmithKline Beckman Corp.
Henri Wolbrette, III, Kathleen A. Manning, McGlinchey, Stafford, Mintz, Cellini & Lang, P.C., New Orleans, for defendant-appellee, Pfizer, Inc.
John J. Weigel, Donna G. Klein, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant-appellee, Armour Pharmaceutical Co.
Before KLIEBERT, GAUDIN and WICKER, JJ.
KLIEBERT, Judge.
This appeal comes to us on the granting of a motion for a directed verdict filed by the defendant drug manufacturers following an eight day jury trial of plaintiffs Jerry and Judy Rhoto's claim for damages allegedly arising from Mrs. Rhoto's taking prescribed drugs. For the reasons hereafter stated, we affirm the trial court's judgment in all respects.
The events out of which the suit arose are as follows: On February 20, 1979 Mrs. Judy Rhoto, a thirty-six year old, slightly overweight, half-a-pack a day smoker, was examined by Dr. R.T. Ribando, a professed (he had not received specialized training in bariatric medicine) weight reduction specialist. He prescribed a regime of prescription medications which, coupled with a conservative diet plan, allegedly effectuated dramatic weight loss. The medications and their manufacturers were as follows:
1) Ortho Novum 1/50-21a birth control pill manufactured by Ortho Pharmaceuticals;
2) Thyrolar 5a thyroid medication manufactured by Armour Pharmaceutical;
3) Renesetma diuretic manufactured by Pfizer Laboratories;
4) Human chorionic gonadotropin (HCG) a fertility hormone injected intra-muscularly, manufactured by Dunhall Pharmaceuticals;
5) Eskatrolan amphetamine manufactured by SmithKline Beckman Corporation.
Mrs. Rhoto followed the regime set forth by Dr. Ribando for two weeks. On the evening of March 4, 1979 she experienced difficulty in speaking. The following morning she collapsed immediately after entering Dr. Ribando's office. Mrs. Rhoto was taken to Mercy Hospital, where she was diagnosed by Dr. Sampognaro, an internist, and Dr. Richard Palmer, a neurologist, as having suffered a massive stroke. An angiogram demonstrated severe diffused stenosis (narrowing) of the supraclinoid portion of the right interior carotid artery and complete occlusion or blockage of the left middle cerebral artery at its origin. The stenosis was caused by arteriosclerosis; the occlusion or blockage was a thrombotic event caused by a blood clot.
Plaintiffs brought this suit seeking to recover damages, allegedly sustained as a result of the stroke against Dr. R.T. Ribando, who prescribed the medications, and against the manufacturers of the medications, namely, defendants, Mayrand, Inc., Ortho Pharmaceuticals, Inc., Armour Pharmaceutical Corporation; Pfizer Laboratories, Inc., SmithKline Beckman Laboratories, and Dunhall Pharmaceuticals, Inc. When it was discovered Mayrand, Inc. did not manufacture any of the drugs administered to Mrs. Rhoto, it was voluntarily dismissed as a defendant. Dunhall made no appearance in the suit and hence did not file a motion for a directed verdict. Since the judgment appealed from does not pertain to Dunhall it is not a party to this appeal. Plaintiffs' suit against Dr. Ribando was settled prior to trial. Thus, the drug manufacturers involved on the appeal are those above named as defendants, except for Mayrand, Inc. and Dunhall.
Plaintiffs made no attempt to show the drugs prescribed by Dr. Ribando were either unreasonably dangerous per se or flawed by a construction defect.[1] Rather, *1121 their case against the drug manufacturers was grounded in the contention the manufacturers failed to warn of the danger of a stroke when the product was used individually or in combination with the other drugs prescribed in Mrs. Rhoto's weight reduction program. Moreover, in a third amended and supplemental petition, plaintiffs alleged and argue here that Judy Rhoto's ingestion of Ortho Novum SQ (an oral contraceptive manufactured by Ortho and sometimes referred to as Ortho Sequentials) caused a restriction of the opening for the passage of blood through the arteries (arterioscleroris), thus damaging her vascular system and contributing to the cause of the stroke. Therefore, they contend the defendant Ortho is further liable because it failed to warn of the risk of stroke associated with oral contraceptives or that the risk was enhanced when the patient smoked.
At the conclusion of the case, the defendants filed for and the trial judge granted a motion for a directed verdict. In Courtney v. Winn-Dixie Louisiana, Inc., 447 So.2d 504, 507 (5th Cir.1984) writ denied 449 So.2d 1359, the court set forth the standard to be applied in deciding a motion for a directed verdict as follows:
"[o]n motion for directed verdict and for judgment notwithstanding the verdict, the court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions(sic) is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."
See also Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986).
In his reasons for granting the motion the trial judge here said:
"In reviewing the evidence as I recall it and arguments of counselors I find no evidence that any of the drugs are reasonably dangerous in normal use. That the evidence conclusively showed that they were being grossly mis used(sic) by Dr. Ribando. I find that the injury suffered by Mrs. Rhoto was due to the negligence of Dr. Ribando. As to the contention for failure to warn or inadequate warning the facts and inferences of all the evidence solicited by plaintiff points so strongly and overwhelmingly in favor of the defendants that the Court believes that reasonable men could not arrive at a contrary verdict. Accordingly, I am going to grant Motion for Defendants for a Directed Verdict." (Tr., Vol 15, January 16, 1986, p. 2).
Thus, the question before us is not to decide whether the drug manufacturers are liable for plaintiffs' injury. Rather, we must decide whether the record supports the trial judge's conclusion that given the evidence submitted and viewing same in the light most favorable to the plaintiffs, it was so overwhelmingly in favor of the defendants that reasonable men could not have arrived at a verdict for the plaintiffs.
Necessary to reaching a conclusion on the question before us is an inquiry into the plaintiffs' burden to prove liability. In determining legal responsibility in tort claims, as stated in Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), our courts have employed the duty risk analysis which requires pertinent inquiries quoted at page 1370 as follows:
(1) Whether the conduct of which plaintiff complains was a cause-in-fact of the harm;

*1122 (2) Whether there was a duty on the part of the defendant which was imposed to protect against the risk involved;
(3) Whether there was a breach of that duty; and
(4) Damages.
First, we inquire into causation.
Here, within two weeks of starting the diet program, Mrs. Rhoto suffered a stroke. There are conflicting medical opinions as to whether it was "more probable than not" that the prescribed medications, in conjunction with smoking, caused the stroke. Mrs. Rhoto's treating physician, Dr. Sampognaro, was of the opinion that the "most important" drug as to the cause of the stroke was the oral contraceptive because the synergistic effect with smoking was widely regarded as a leading cause of vascular disease such as arteriosclerosis. Dr. Palmer declined to express an opinion as to the cause of the stroke.
Dr. Barry Singer, who was accepted as an expert in internal medicine with sub-specialties in hematology and oncology, testified that based on his review of the plaintiff's medical records and history, it was more probable than not that each drug in combination with the others contributed to the stroke,[2] and that the earlier ingestion of Ortho Novum SQ while smoking likewise more probably than not contributed to the stroke by damaging the vascular system. Dr. Singer's testimony was echoed by that of Dr. Jasbir Singh, who was accepted as an expert in clinical pharmacology and medicine. Their conclusions were based on their knowledge of the effects of the individual drugs and the synergistic effect which results when several drugs are ingested in unison. The particular effects they attributed to the drugs were as follows:
(1) Renese concentrated the blood volume and hence increased viscosity;
(2) Thyrolar-5 and Eskatrol increased the metabolic rate and blood pressure;
(3) HCG elevated the estrogen level which heightened the risk of thromboembolism;
(4) Ortho Novum SQ and 1/50-21 contributed to a buildup of fibrinogen deposits (plaque) on the arterial walls and elevated estrogen levels and blood pressure.
Defendants contend the factual evidence, i.e., Mrs. Rhoto's medical records, reflected neither an increase in blood pressure nor a hemoconcentration of the blood volume. However, there was testimony that Mrs. Rhoto's blood pressure at the exact moment the stroke occurred was unknown and could have been affected by subsequent gastro-intestinal bleeding from a stress ulcer, and although Dr. Sampognaro testified Mrs. Rhoto had a normal hematocrit (blood volume level) on the day of her admittance, her glucose level was elevated which, according to Dr. Singh, was an indication that some level of blood volume concentration was present. Dr. Singer found no evidence of hemoconcentration but noted that interaction of Renese with the other drugs remained a possibility.
Dr. Marengo-Rowe, an expert in hematology and pathology who testified on the defendants' behalf, stated the elevated glucose level was not high enough to cause concern about hemoconcentration or increased blood viscosity. He stated he did not know whether oral contraceptives caused thromboembolism or stroke and expressed no opinion as to the cause of Mrs. Rhoto's stroke. A defense witness, Dr. Samuel A. Pasquale, was accepted as an expert in obstetrics, gynecology and clinical studies on drugs and the format of package inserts. He testified that in his opinion oral contraceptives and smoking increased the risk of thrombolic disease.
The foregoing brief synopsis of the evidence regarding causation is by no means intended as an exhaustive, in-depth analysis but merely intended to show that there are conflicting expert medical opinions on *1123 the issue. The credibility of the witness and, hence, the weight to be afforded their testimony directly affects critical factual determinations. Thus, there was sufficient evidence as regards medical causation to have warranted submission of the issue to the jury.
Notwithstanding medical causation, however, to recover, the plaintiffs must show that the manufacturers of the drugs prescribed by Dr. Ribando knew of the dangers or side effects of the drugs but breached their duty by failing to warn of the dangers. Hence, our next inquiry is into the defendants' duty to warn of dangers and their breach of that duty.
The scope of the manufacturers' duty to warn the consumer of risks or contraindications associated with use of a product was succinctly set forth in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 114-115 (La.1986) as follows:
"[7-9] Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978); cf. Rey v. Cuccia, 298 So.2d 840 (La.1974). In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. See Keeton, Product LiabilityProblems Pertaining to Proof of Negligence, 19 Sw.L.J. 26, 30-33 (1965). A manufacturer also has a duty to test and inspect its product, and the extent of research and experiment must be commensurate with the dangers involved. See Dartez v. Fibreboard Corp., 765 F.2d 456 (5th Cir.1985); Gideon v. Johns-Manville, 761 F.2d 1129 (5th Cir. 1985); Borel v. Fibreboard Paper Products Corporation, 493 F.2d 1076, 1089 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107." (Emphasis Supplied)
A drug manufacturer has no duty to warn the consumer directly of any risks or contraindications associated with its product. The obligation to the consumer is fulfilled when the prescribing or treating physician is informed of the risks of harm from the drug. The physician acts as an informed intermediary, and the decision to use the drug in a particular circumstance rests with the doctor and the patient, not the manufacturer. Kinney v. Hutchinson, 468 So.2d 714 (5th Cir.1985), writ denied 472 So.2d 35; Miller v. Upjohn Co., 465 So.2d 42 (1st Cir.1985), writ denied 467 So.2d 533; Cobb v. Syntex Laboratories, Inc., 444 So.2d 203 (1st Cir.1983).
Drug companies use package inserts to warn physicians of the side effects and adverse reactions associated with their products. The physician receives the package insert whenever a company detailman (salesman) provides him with a sample of the product. All printed advertisements in medical literature include the package inserts. The package inserts are also compiled in the Physicians' Desk Reference (PDR) which is updated annually, and physicians nationwide receive a free copy of the publication. The Food and Drug Administrtion (FDA) closely regulates warnings which appear in the package inserts, and approval of the FDA must be obtained if the warnings are to be updated.
Dr. Ribando testified that he annually received a copy of the PDR and that he consulted it when prescribing prescription medications. Although at trial Dr. Ribando did not remember whether he had received the 1979 PDR prior to treating Mrs. Rhoto, during the deposition given in 1981 Dr. Ribando stated he did have the 1979 PDR available when treating Mrs. Rhoto.
Plaintiffs aver that the warnings for the individual drugs were inadequate in that they did not have timely warnings *1124 about the misuse of their product in weight control programs involving certain other drugs, a practice which they knew or should have known was taking place. In addressing this contention we first note that every expert called by both plaintiffs and defendants were in agreement that the prescription of the combination of drugs used by Dr. Ribando was a gross misuse of the products and that they would not have implemented such a diet plan. As noted previously, a manufacturer is obligated to warn of any danger inherent in the normal use of its product.
Dr. Ribando testified he received the diet plan from a doctor in Metairie who was using the plan for weight reduction and "I have here from two, from three different doctors that were using this plan ... and had done some research into it." When questioned as to whether the detailmen for the drug companies were aware he was using their products in a diet plan, Dr. Ribando stated it was common knowledge that Eskatrol was used in weight control programs. He specifically stated the detailmen for Pfizer, the manufacturer of Renese, did not necessarily know he was using it in a weight control program.
The alleged deficiencies in the warnings on the individual products are as follows:

(1) THYROLAR-5 (Armour)
Plaintiffs do not point out deficiencies in the 1979 Physicians Desk Reference warnings but rather contend the 1978 Physicians' Desk Reference warnings were inadequate. As noted previously, the only exclusive testimony on the issue established Dr. Ribando had a 1979 Physicians' Desk Reference available at the time he prescribed Thyrolar-5 for Mrs. Rhoto. Further, package inserts for Thyrolar-5 as of June of 1978 carried the same warning as the 1979 PDR. Neither the 1978 nor the 1979 inserts indicated Thyrolar-5 was of any value or intended for use in weight control programs. The revised warnings in the 1979 PDR and June 1978 package inserts provide in part:
"Drugs with thyroid hormone activity, alone or together with other therapeutic agents, have been used for the treatment of obesity. In euthyroid patients, doses within the range of daily hormonal requirements are ineffective for weight reduction. Larger doses may produce serious or even life-threatening manifestations of toxicity, particularly when given in association with sympathomimetic amines such as those used for their anorectic effects."
Thus, the manufacturer of Thyrolar-5 specifically warned against its use in weight reduction programs and the harm associated with misuse, particularly with sympathomimetic amines. "Eskatrol" contains dextroamphetamine sulfate, which is the dextro isomer of the compound d, 1-amphetamine sulfate, a sympathomimetic amine of the amphetamine group.

(2) ESKATROL (SmithKline Beckman)
This was the only prescribed medication of which indications included use in weight control. Plaintiffs aver the warnings were deficient in that they did not address use in conjunction with other drugs "commonly" used in weight control programs such as Thyrolar or Digitalis. As Digitalis was not part of the diet program, the adequacy of the warnings as regards that class of drugs is irrelevant in the present case. The warnings do indicate that Eskatrol should not be prescribed to a patient who is hyperthyroid. Yet Dr. Ribando testified that the reason he prescribed Thyrolar in the diet was to make Mrs. Rhoto hyperthyroid. The prescription of Thyrolar was in direct contradiction to the published contraindications for Eskatrol.

(3) RENESE (Pfizer)
Plaintiffs contend the warnings were inadequate in that they did not state Renese was ineffective in weight control programs. The prescribing information for Renese does not indicate that it is intended for use in weight control programs. All expert testimony was to the effect that neither Renese nor any other diuretic had any legitimate use in the treatment of obesity and that use of the drug for such purposes *1125 amounted to misuse. Dr. Ribando stated the manufacturer of Renese did not necessarily know he was using the product in a weight control program. Again, a manufacturer need only warn of the dangers associated with the normal use of the product. As normal use of Renese did not include weight control and the plaintiff did not show the manufacturer knew he was using the product for said purposes, it follows there was no breach of duty in not warning against such abuse.

(4) HCG (Dunhall)
Plaintiffs contend the warnings were inadequate in that they did not warn against use by smokers or in combination with oral contraceptives. We again note that Dunhall is not an appellee and thus we decline to address plaintiffs' arguments as to the adequacy of the warnings, except to note that the package insert for HCG indicated that it had not been demonstrated to be effective adjunctive therapy in the treatment of obesity and has no known effect on fat mobilization. Thus, the manufacturer of HCG clearly warned against its use in weight control programs.

(5) ORTHO NOVUM (Ortho)
Plaintiffs submit that their case against Ortho is not based on Mrs. Rhoto's ingestion of Ortho 1/50-21 in connection with the diet plan, but rather her ingestion of the Novum SQ from 1967-1972 while smoking. Plaintiffs admit the warnings on Ortho 1/50-21 were adequate with regard to smoking and the risk of thromboembolism. The 1979 warnings provide in part:
"Cigarette smoking increases the risk of serious adverse effects on the heart and blood vessels from oral contraceptive use. This risk increases with age and heavy smoking (15 or more cigarettes per day) and is quite marked in women over 35 years of age. Women who use oral contraceptives should not smoke."
The adverse effects are listed in part as abnormal blood clotting, heart attack, and stroke due to hemorrhage.
Plaintiffs contend this type of warning should have been issued with Ortho Novum SQ, which Mrs. Rhoto took intermittently from 1967-1972. Defendant Ortho contends that as neither package inserts nor the PDR for 1968-1972 were introduced by plaintiffs to establish what warnings were issued for Ortho Novum SQ at the time Mrs. Rhoto was taking them, it is impossible to determine whether the warnings were adequate.
Defendant Ortho did introduce an unopened package of Ortho-Novum SQ which contained a label warning of serious side effects, including "abnormal blood clotting which can be fatal. Safe use of this drug requires careful discussion with your doctor. To assist him in providing you with the necessary information, a booklet has been prepared that is written in a style understandable to you as the drug user. This provides information on the effectiveness and known hazards of the drug, including warnings, side effects and who should not use it. Your doctor will give you this booklet if you ask for it and he can answer any questions you may have about the use of the drug." There is no indication as to the date this warning was authorized for the Ortho Novum SQ packages, what additional warnings the booklet contained, or whether Mrs. Rhoto received the booklet or was informed of the dangers.
Defendant Ortho also introduced a copy of a FDA letter dated January 12, 1970 and enclosing revised labeling for oral contraceptives. The label did not warn of a relationship between smoking and contraceptives, nor did revised 1976 labels warn of the relationship.
Plaintiffs introduced a Public Health Report dated March 1970 and entitled "Thromboembolism, Oral Contraceptives, and Cigarettes." The report concluded users of oral contraceptives who were heavy smokers had an incidence of thromboembolism 23 times that of women who neither used oral contraceptives nor smoked cigarettes. The author suggested that the possible potentiating effect suggests that oral contraception be considered as another contraindication to cigarette smoking. Defendant Ortho introduced a 1971 study entitled "Oral Contraceptives and Thromboembolism: A Further Report." The author concluded his analysis demonstrated an association between smoking and use of oral contraceptives of borderline significance, but no evidence *1126 that smoking, acting either independently or in conjunction with oral contraceptives, was a factor in idiopathic thromboembolism: "the idea is a reasonable one ... but in this particular study, dealing primarily with peripheral venous thrombosis and pulmonary embolism, it could not be implicated."
Thus, the plaintiff did show that as early as 1970 an association was drawn between smoking and oral contraceptives as implicated in thromboembolism. This association is discussed in the 1978 PDR information on Ortho-Novum tablets. Nevertheless, the warnings by Ortho as to side effects of Ortho Novum SQ as of 1972 reflected the state of medical knowledge at the time. Research which disclosed a relationship between smoking, oral contraceptives and thromboembolism was in its infancy.
For the foregoing reasons, therefore, we conclude that reasonable men could not differ as to a finding that the warnings supplied by the drug manufacturers adequately informed Mrs. Rhoto of known risks associated with the normal use of their products as of the time the products were prescribed. Absent a breach of their duty to warn, there can be no liability on the part of the defendants. Accordingly, the judgment of the trial court is affirmed in all respects.
AFFIRMED.
NOTES
[1] In the opening statement to the court, counsel for plaintiffs said:

"We're not here before you to prove that any of these drug products are, of themselves, defective or dangerous. They do what they are supposed to do. They didn't break down. Every one of these products have or have had a place in valuable therapy in different patients."
[2] Part of the testimony was proffered after the defendants averred the proper standard was a "reasonable medical certainty," which Dr. Singer understood to mean "almost 100% certain." In order to be probative, medical evidence need only be "more probable than not." Hence, we will consider the testimony introduced by proffer.