628 So.2d 1181 (1993)
Darrell COOPER, Sara Cooper, Henry J. Cooper, Gregory Cooper, Gary Cooper, Pamela Gale Cooper, and Cherlita Hall, Plaintiffs/Appellants/Appellees,
v.
Dr. John C. SAMS, Dr. Ulla Jo Ule, Dr. William Earnest Weldon, St. Frances Cabrini Hospital, Individually and for the Acts of its Nursing Employees, Dr. Ronald Lewis, and Nurse Rodger Lee McCain, Defendants,
The Louisiana Patient's Compensation Fund, Defendant/Appellant,
Taylor Pharmacal Co. and Janssen Pharmaceutica, Inc., Defendants/Appellees.
No. 93-215.
Court of Appeal of Louisiana, Third Circuit.
December 8, 1993.
Writ Denied February 25, 1994.
*1182 Alex W. Wall, JoAnn Purcell Levert, for Darrell Cooper et al.
Milo Addison Nickel Jr., Elizabeth Brooks Hollins, for Patient's Compensation Fund.
George Gore, Irene K. Walker, James A. Bolen Jr., Daniel G. Brenner, for Taylor Pharmacal Co. and Janssen Pharmaceutica, Inc.
Before DOMENGEAUX, C.J., and YELVERTON and THIBODEAUX, JJ.
DOMENGEAUX, Chief Judge.
Sara Cooper, individually, and as curator for her interdicted son, Darrell Cooper, filed *1183 this medical malpractice and products liability suit after her son sustained brain damage while a patient at St. Frances Cabrini Hospital in Alexandria.[1] Named as defendants were Drs. Sams, Ule, Weldon, and Lewis, Nurse McCain, St. Frances Cabrini Hospital, Taylor Pharmacal Co., and Janssen Pharmaceutica, Inc. Prior to trial, Cooper voluntarily dismissed the physicians and Nurse McCain and settled with the hospital for $100,000.00, which settlement constituted a statutory admission of the hospital's liability under La.R.S. 40:1299.44(C)(5).[2]
Cooper then proceeded against the Louisiana Patient's Compensation Fund for all damages in excess of $100,000.00. The Fund denied liability for excess damages and filed a third party demand against Taylor and Janssen. The trial court granted summary judgment in favor of Taylor and Janssen, dismissing them from Cooper's main demand and from the Fund's third party demand. A jury trial was then held to determine the amount of damages, if any, owed to Cooper by the Fund.
The jury returned a verdict in Cooper's favor for the following amounts of damages:

1) Bodily injury, pain, suffering, and mental
 anguish .................................. $ 285,000.00
2) Permanent disability ..................... 570,000.00
3) Economic loss
 a) Past lost wages ....................... 67,165.00
 b) Loss of future earning capacity ....... 261,250.00
4) Loss of consortium for Sara Cooper ....... 75,000.00
5) Past medical expenses .................... 146,490.00
6) Future medical care and related benefits . 1,187,500.00

The trial court rendered judgment in accordance with the jury verdict but noted that the judgment was subject to the provisions of La.R.S. 40:1299.41 et seq., which contain certain limitations of liability and restrictions on payment by the Fund.[3]
The Fund has appealed the award of damages[4] and the dismissal, via summary judgment, of Taylor and Janssen. Cooper has also appealed the dismissal of Taylor and Janssen. For the reasons which follow, we affirm.

FACTS
On April 11, 1985, 21 year old Darrell Cooper was admitted to St. Frances Cabrini Hospital with fever and a rash. As a child, Cooper had been diagnosed with sickle cell anemia, a congenital blood disorder characterized by abnormal hemoglobin which requires continual medical maintenance, and may involve periodic sickle cell crises which sometimes warrant hospitalization, blood transfusions, and other therapies. On April 11, however, Cooper's symptoms did not appear to be related to his sickle cell disease. Rather, at the time of his admission, Cooper appeared to be experiencing an allergic reaction to an over-the-counter antacid, or he may have had an infection. Immediately prior to his hospitalization, Cooper was an engineering student at Louisiana Tech University and was in the course of final exams for the quarter.
*1184 During the next several days, Cooper's condition worsened and he continued to run fever. He began to evidence the symptoms of a sickle cell pain crisis for which he was given fluids and various blood products. Cooper was also experiencing severe abdominal pain and vomiting which may have been indicative of gallbladder disease. On the night of April 22, it was decided by Cooper's treating physicians that emergency surgery should be performed. Accordingly, late that night, a cholecystectomy (gallbladder removal) and liver biopsy were performed.
The surgeon, Dr. Weldon, testified that the procedures were uneventful and Cooper was returned to the intensive care unit shortly after midnight on April 23. He was accompanied by the anesthesiologist, Dr. Lewis, and the certified registered nurse anesthetist, Nurse McCain. Cooper was still sedated and was on a ventilator. At 1:00 a.m., Cooper experienced what the ICU nurse described in her notes as a seizure and what Dr. Lewis described in his deposition as a clonic-tonic reaction. Cooper was given valium which controlled the movement.
At 1:20 a.m., Cooper began to reject the endotracheal tube. Because Dr. Lewis wanted Cooper to remain on the ventilator as long as possible, he instructed Nurse McCain to give Cooper an injection of Sublimaze to further sedate him. Twenty minutes later, Dr. Lewis and Nurse McCain left Cooper in the care of the ICU nurse.
During the next two hours, Cooper experienced more seizure activity and escalating temperature. At some point, Dr. Weldon was informed of the seizure activity and ordered Dilantin, a seizure medication. He was not informed of Cooper's temperature or other vital signs. At 3:20 a.m. and at 3:35 a.m., Dr. Sams, the internist, was notified of Cooper's condition. He arrived at Cooper's bedside at 3:45 and immediately poured ice all over Cooper's body. He ordered various treatments and medications including Dantrium, which seems to be the antidote that finally brought the fever down after it climbed over 108°.
Cooper then lapsed into a semicomatose state for several days and may have suffered a stroke. As a result of these physical developments, Cooper suffered permanent brain damage affecting his cognitive functioning and has physical weakness on his right side. Cooper remained hospitalized at Cabrini for several weeks, then was transferred to other facilities for the next several months. At first, Cooper did not recognize family members; he was later taught how to read and write again. At the time of trial, Cooper did not remember his college experiences and could not live independently, hold a job, or function in any way as before. His brother compared his condition to that of a second grader.

THEORIES OF CAUSATION
While Cooper remained hospitalized after his gallbladder surgery, his treating physicians, and others who were consulted on the case, tried to determine what had happened to cause the fever episode and subsequent brain damage. One theory was infection; in fact, Cooper was diagnosed with mononucleosis, hepatitis, pneumonia, and gallbladder disease. Another theory was a sickle cell crisis involving as the end organ that portion of the brain which regulates temperature. However, that portion of the brain evidenced no damage after the one fever episode. A third suggestion was that Cooper suffered a stroke, which either caused the high fever or was the result of the high fever. Clinically, Cooper did appear to have suffered a stroke but several CT scans could not confirm it, and Cooper's brain damage is not consistent with a stroke, which usually affects a specific area of the brain; conversely, Cooper's brain damage is considered diffuse.
The plaintiff has suggested, and some of the physicians agree, that Cooper developed a condition known as malignant hyperthermia, which is characterized by high fever, rapid pulse, acidosis, unusual calcium levels within the skeletal muscles, and other abnormalities. Malignant hyperthermia is a rare condition believed to be triggered by anesthesia or severe physical or emotional stress *1185 in genetically predisposed individuals. Dantrium is the drug of choice for malignant hyperthermia because it adjusts the patient's calcium levels so that the body is able to release heat and rid itself of the fever.
A related theory of the cause of Cooper's condition was that the continuous seizures, diagnosed clinically as status epilepticus, caused the fever. The plaintiff suggests that either the status epilepticus or the malignant hyperthermia, or both, were caused by the drug Sublimaze which was administered to Cooper both during and after surgery.[5] Sublimaze is a potent narcotic used in high doses as an anesthetic and in lower doses as an analgesic. It is manufactured and distributed by Taylor and Janssen, under a contractual arrangement.

THEORIES OF LIABILITY
In his appeal, Cooper contends that both the hospital and the pharmaceutical defendants are liable for his damages. The nature of the hospital's alleged liability is twofold. First, according to Cooper's expert, Dr. Stephen Speeg, a specialist in internal medicine and pediatrics, the hospital laboratory failed to report certain crucial blood test results prior to Cooper's surgery. This act of negligence was barely mentioned at trial and was not otherwise developed in the record.
The second act of negligence on the part of the hospital has to do with the nursing care received by Cooper in ICU in the hours immediately following his surgery. Cooper contends that nursing delays in contacting a physician, controlling the seizures, and bringing down the fever caused him damage. Further, the nurses failed to adequately monitor and document Cooper's vital signs and failed to follow a protocol for the treatment of Cooper's symptoms.
Cooper's allegation of liability on the part of Taylor and Janssen is premised on products liability law. Cooper contends that the drug Sublimaze is defective because it caused him to experience seizures and/or malignant hyperthermia which led to his brain damage. Additionally, Cooper asserts the drug companies are liable for failing to warn the anesthesiologist and ICU personnel in this case that Sublimaze can cause seizures and malignant hyperthermia; such warnings should have been included, Cooper contends, in the package insert and Physicians' Desk Reference.
In denying liability for damages in excess of $100,000.00, the Patient's Compensation Fund does not contest the negligence of the hospital. Rather, the Fund contends that the hospital's negligence was not the sole cause of Cooper's damages. The Fund suggests that Cooper's adverse reaction to Sublimaze and the natural course of his sickle cell disease, which can include strokes and brain damage, both contributed to his damages.
Taylor and Janssen vehemently oppose the suggestion by Cooper and the Fund that Sublimaze, the brand name for the drug fentanyl, can cause seizures or malignant hyperthermia. They presented a myriad of experts who testified to the contrary. For instance, they suggest that Sublimaze has been administered to over 400,000,000 people and has never been known to cause seizures or malignant hyperthermia; in fact, they argue that a clinical report of seizures or seizure like activity from Sublimaze was subsequently disproved. Further, Sublimaze is considered the anesthetic of choice for patients prone to malignant hyperthermia. These issues came before the trial court on a motion for summary judgment, and after full consideration, the trial judge concluded that no genuine issue of material fact existed on the question of a defect inherent in the drug Sublimaze or whether Sublimaze caused Cooper's damages. Accordingly, the trial judge granted summary judgment and dismissed Taylor and Janssen.
The dispute between Cooper and the Fund concerning excess damages went before the jury and the jury implicitly found that the negligence of the hospital was the sole cause *1186 of Cooper's damages. Accordingly, judgment was rendered in favor of Cooper and against the Fund.

ANALYSIS
The controversy over damages between Cooper and the Fund was presented to a jury. Cooper presented minimal evidence and the Fund presented no evidence. Cooper's treating hematologist, Dr. Ulla Jo Ule, reviewed Cooper's hospital stay but did not give an opinion as to the cause of his damages. Cooper's expert, Dr. Speeg, testified that in his opinion Cooper may have experienced malignant hyperthermia as a reaction to the drug Sublimaze, or other drugs given during surgery but that it was the failure to promptly treat the symptoms of the hyperthermia, i.e., the fever, that caused Cooper's damages.
In its cross examination of Dr. Ule, the Fund brought out a wealth of information on the disease process of sickle cell anemia, how it can affect the neurological system to cause strokes, and how its victims generally do not live beyond the fourth decade. However, Dr. Ule did not testify or even allude to the cause of Cooper's damages, and whether they are the result of the hospital's negligence or Cooper's natural disease process. On the other hand, Dr. Speeg testified that regardless of the cause of Cooper's fever, it was the failure to treat the fever that caused the injuries.
In this appeal, the Fund contends that Dr. Speeg's testimony should not have been allowed and that Cooper's evidence was insufficient to carry his burden of proof. Concerning the admissibility of Dr. Speeg's testimony, we find no error in the trial court's ruling. The Fund argues that Dr. Speeg did not have the necessary qualifications to offer an opinion in neurology, his testimony was so inconsistent that it was rendered implausible on its face, and his opinion was not based on sufficient facts. We find no merit to these contentions.
Dr. Speeg testified at trial immediately after Dr. Ule. Dr. Speeg practices general internal medicine along with pediatrics, fields which encompass a broad range of diseases. On the other hand, while Dr. Ule is also an internist, she has limited her practice to hematology and oncology. Dr. Ule testified that she was not qualified to state whether high fever can cause brain damage. Conversely, Dr. Speeg reviewed his medical school and clinical experience in the field of neurology and testified that high fever can cause diffuse brain damage and did cause Cooper's brain damage in this case.
We are not prepared to state that when one expert disqualifies herself from rendering an opinion, all similar experts must be disqualified from rendering an opinion on the same question. The trial court found Dr. Speeg sufficiently qualified to render his opinion on the cause of Cooper's brain damage and suggested that any lack of training or experience on his part would affect the weight of his testimony and not its admissibility.[6] We find no error in this conclusion.
We likewise find no merit to the argument that Dr. Speeg's testimony should not have been considered because it was both implausible and not factually supported. Counsel for the Fund, through cross examination, adequately illustrated for the jury certain inconsistencies in Dr. Speeg's testimony and his lack of familiarity with the entirety of Cooper's medical history. This critique goes to the weight of the testimony and not its admissibility. Again, we find no error in the evidentiary rulings of the trial court.
Turning now to the plaintiff's burden of proof, the Fund correctly argues that *1187 when a health care provider's fault has been statutorily admitted and has therefore been established to have caused some damage, the plaintiff must still prove what damage was caused by that fault. See Savelle v. Heilbrunn, 552 So.2d 52 (La.App. 3d Cir.1989), writ denied, 556 So.2d 1267 (La.1990), and Moolekamp v. Rubin, 531 So.2d 1124 (La. App. 4th Cir.1988). Accordingly, to determine if Cooper carried his burden of proof, we must review the evidence that was presented during his case in chief.
Prior to his hospitalization, Cooper was a college student with one year left in the civil engineering curriculum. He had a summer job offer in the engineering field and was engaged to be married. He had a lifetime history of sickle cell anemia but had been able to manage his disease adequately and was able to live independently. Statistically, he had only 10 to 20 more years to live, with a gradual progression of his disease, but there was nothing to indicate that he would have been unable to work or have a family during that time.
During the course of Cooper's hospitalization, the hospital committed a negligent act by delaying treatment for an escalating temperature. This was an admitted act of negligence which caused some damage. Implicit in the jury verdict is necessarily the finding that the admitted act of negligence caused all of Cooper's damages. The question presented by the Fund is whether such a finding is sufficiently supported by the evidence.
The record before us is riddled with unknowns such as whether Cooper had a stroke, or malignant hyperthermia, or an infection, or all three. It is not known whether a stroke caused the fever, or the fever caused a stroke. The only facts established are that Cooper experienced high fever and suffered brain damage. The etiology of the fever was unknown to the treating physicians, or at least they did not articulate a cause in the medical records and testimony.
Cooper's expert offered his opinion that high fever can cause diffuse brain damage and the jury chose to believe that, more probably than not, that is what occurred in this case. The jury essentially concluded that regardless of the etiology of the fever, the failure to control it caused Cooper's damages. Dr. Speeg's testimony supported this conclusion and no other witness offered any other explanation.
The premise of the Fund's defense seems to have been that Cooper suffered a stroke as the natural result of his sickle cell disease. Both Drs. Ule and Speeg testified that strokes are common in sickle cell patients and can cause brain damage. However, neither physician testified that is what occurred in this case. After reviewing all of the evidence presented herein, we find Cooper fulfilled his burden of proof.
Finally, we turn to the summary judgment granted in favor of Taylor and Janssen and against Cooper and the Fund. We have reviewed the voluminous evidence submitted in support of and in opposition to the motion and conclude that summary judgment was appropriately granted in this case.
The expert evidence reveals that Sublimaze is a commonly used anesthetic agent, having been administered to over 400,000,000 patients worldwide. It is not known to cause seizures or malignant hyperthermia and is in fact the anesthetic of choice for patients known to be prone to malignant hyperthermia. None of the anesthesiologists who testified in this case (Dr. Boyd for Cooper, Dr. Flewellen for Dr. Lewis, and Drs. Stanley and Brown for the pharmaceutical companies) thought that Sublimaze caused the problems experienced by Cooper. Sublimaze is a drug known to cause certain side effects in some patients, but the expert testimony failed to show that Sublimaze was known to cause, could have caused, or did cause the symptoms experienced by Cooper in the hours following his surgery.
The trial judge held that Cooper and the Fund failed to raise a genuine issue of material fact on the question of whether Sublimaze was defective and caused Cooper's *1188 damages. After reading all of the expert testimony and factual accounts from those who treated Cooper, we overwhelmingly agree with this conclusion. The trial judge prepared written reasons for judgment which we adopt as our own and attach to this opinion as an appendix.
We specifically agree with the trial court's finding that Dr. George, while certainly an eminently qualified expert in pharmacology and toxicology, did not render an opinion in this case based on personal knowledge. Dr. George theorized that Sublimaze caused Cooper to experience seizures which increased his temperature and led to brain damage. His theory was based on reports of seizure activity induced by Sublimaze. These reports were later disproved by clinical studies. Therefore, the foundation of Dr. George's theory is an unreliable, scientifically disproven third party account which cannot be considered on a motion for summary judgment. Accordingly, we affirm the summary judgment for the reasons stated by the trial judge.

DECREE
For the reasons assigned, the judgment of the trial court in favor of Cooper and against the Louisiana Patient's Compensation Fund is affirmed, and the judgment in favor of Taylor Pharmacal Co. and Janssen Pharmaceutica, Inc. is likewise affirmed.
One-third of the costs of this appeal are to be paid by Cooper, and the remaining two-thirds of the costs are to be paid by the Patient's Compensation Fund, to the extent allowed by law.
AFFIRMED.

APPENDIX

REASONS FOR JUDGMENT
This is an action in products liability. The case comes before the Court on motions for summary judgment filed by defendants, Janssen Pharmaceutica, Inc. and Taylor Pharmaceutical Company (referred to collectively as Janssen).
Plaintiff was extremely ill and underwent surgery. Both during and after the surgery, doctors administered various drugs, including Fentanyl. Some time after receiving the Fentanyl and other drugs, Mr. Cooper started having movements in his extremities. He also developed a very high fever. Apparently, he suffered brain damage during that crisis.
Plaintiffs sued various health care providers, as well as Janssen, the manufacturer of Fentanyl. Janssen is the only defendant left in the case, as plaintiffs have settled with the health care providers.
The Court must decide whether a genuine issue of material fact exists and whether Janssen is entitled to judgment as a matter of law. La.Code Civ.P. art. 966. Bonstill v. Goldsberry Operating Co., 478 So.2d 729 (La. App. 3 Cir.1985).
The Court first addresses the issues of fact. Whether facts are material for purposes of summary judgment depends on the applicable substantive law. They are material when, in light of that substantive law, they potentially insure or preclude recovery. Penalber v. Blount, 550 So.2d 577 (La.1989). Therefore, the Court must review the facts in light of the substantive law.
The State Supreme Court case of Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986), rehearing denied, sets out the particular elements of the substantive law which plaintiffs have to prove in order to recover. Under Halphen, they must show that:
1. a danger exists which is inherent in the normal use of Fentanyl;
2. the danger is not within the knowledge of or obvious to the ordinary user of Fentanyl;
3. the manufacturer failed to warn of that danger;
4. the failure to adequately warn caused Mr. Cooper's harm.
*1189 Of all the fact disputes presented, they all tend to revolve around this general issue: what are the dangers inherent in the normal use of Fentanyl?
One side effect of Fentanyl is muscle rigidity and movements in the extremities which are associated with that muscle rigidity. If unchecked, the result can be respiratory depression. These are not fact issues, because the parties do not dispute them.
In addition, plaintiffs' expert, Dr. George, claims that Fentanyl can trigger seizures, which in turn generate a hyperthermic response. He claims that that is what happened in this case, and he bases his conclusions on a medical journal article by Rao.
Janssen disputes these assertions by Dr. George. While this dispute does raise issues of fact, the Court finds that it does not create a genuine issue of material fact.
Before the Court can properly consider Dr. George's statements on this motion for summary judgment, they must be based on his personal knowledge, and they must be admissible in evidence. See La.Code Civ.P. art. 967 and Settoon v. St. Paul Fire & Marine Insurance Company, 331 So.2d 73 (La.App. 1 Cir.1976). See also Ivy v. Freeland, 576 So.2d 1117 (La.App. 3 Cir.1991) (by its clear wording, art. 967 applies to affidavits, but the Third Circuit in Ivy applied the rule to depositions, also).
Applying that rule to this case, the Court notes first that Dr. George's statements are not based on his personal knowledge. His deposition testimony shows that he never administered Fentanyl and never observed patients under its effects. Indeed, Dr. George's depositions make it clear that his assertions as to seizures are actually based on the publication by Rao.
Second, since Dr. George merely stated what Rao had concluded in 1982, Dr. George's statements constitute hearsay and are not admissible in evidence. La.Code of Evidence arts. 801(C) and 802.
The assertions in question do not fall under the "learned treatise" exception to the hearsay rule. To be considered a learned treatise, the Rao article would first have to be established as a reliable authority. La. Code of Evidence art. 803(18). That has not occurred here. To the contrary, expert testimony has established the Rao article as an unreliable authority.
In addition, these particular opinions of Dr. George are inadmissible under La.Code of Evidence art. 703. Under that provision, the test of their admissibility is whether they are based on evidence "of a type reasonably relied upon by experts" in the particular specialized area of expertise. The official comment to art. 703 shows that this is a question for the Court. La.Code of Evidence art. 703, comment (d).
Since the Rao document is an early report, and since anesthesiologists who have administered Fentanyl almost every day for years state that the document has since been refuted by later studies, it is the conclusion of this Court that the Rao article is not of a type reasonably to be relied upon.
Since Dr. George's assertions are not based on his personal knowledge and are not admissible in evidence, the Court cannot consider them on this motion for summary judgment. This conclusion is a consistent with the Third Circuit case of Ivy v. Freeland, 576 So.2d 1117 (La.App. 3 Cir.1991). In Ivy, the court stated that in order to determine whether a genuine issue of fact exists, the trial court must of necessity examine the merits of the case. It also suggested that, despite the presence of disputed facts, those facts presented by one party can be so lacking in substance that in all reality no genuine issue of fact exists.
The Court does not question Dr. George's distinguished position in the medical community as a pharmacologist and toxicologist. It simply notes that plaintiffs have not shown the proper basis in order to have this Court consider those particular facts in question.
*1190 In addition to introducing Dr. George's assertions, plaintiffs introduced an affidavit by Dr. Michael Gilbert. Dr. Gilbert claims that some patients develop fever after receiving Fentanyl.
The deposition of Dr. Ronald Lewis, the anesthesiologist who prescribed the Fentanyl in this case, shows that Janssen does not dispute Dr. Gilbert's claim. Dr. Lewis' deposition states at pages 109 and 110:
"Q. Alright. Let's talk about rigidity..."
"Q. What are the clinical signs for rigidity?
A. If you've got a rigid muscle, it's obvious. If you've got a rigid [masseter] muscle here, they're going to bite down on the tube and they're going to, you're not going to be able to ventilate the patient.
Q. Anything else?
A. It's just going to be muscular rigidity. That's what causes your increase in CO2 production, increase in heat, increased temperature."
The Court finds that Dr. Gilbert's claim does not raise a genuine issue of material fact.
Even if this Court was to consider Dr. George's assertions, and even if, in addition, Dr. Gilbert's claim did raise a fact issue, they still would not present genuine issues of material fact.
As the Court indicated above, it is interested only in those facts which potentially insure or preclude recovery. The facts in question here would do neither. Those facts would address the first essential element of plaintiffs' cause of action, i.e., dangers inherent in the normal use of Fentanyl. They would not change the fact that plaintiffs simply cannot prove the fourth essential elementthat a failure to warn was the CAUSE of their injuries.
Concerning causation, even if Janssen's warnings were inadequate, its failure to warn about fever and about movements in the extremities could not have caused Mr. Cooper's injuries here, because Dr. Lewis already knew of those dangers. Warning about those dangers would have had no effect on the outcome of this case.
See Stewart v. Janssen Pharmaceutica, Inc., 780 S.W.2d 910 (Tex.App. El Paso 1989), rehearing overruled, where a Texas court affirmed the granting of summary judgment based on this same reasoning. See also Stanback v. Parke, Davis & Co., 657 F.2d 642 (4th Cir.1981) (drug company's failure to warn about a risk associated with a vaccine did not cause the harm, because the physician who administered it was fully aware of the risk).
Plaintiffs' inability to prove causation means that they cannot recover. This conclusion necessarily renders all other facts immaterial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The assertions of Dr. George and Dr. Gilbert would do nothing to help further insure or preclude plaintiffs' recovery.
The Court finds that no genuine issues of material fact exist in this case.
The Court next addresses whether Janssen is entitled to judgment as a matter of law.
Plaintiffs did meet the first element of their cause of action. They showed that dangers exist which are inherent in the normal use of Fentanylfever, muscle rigidity, and associated movement in the extremities.
However, plaintiffs failed to present facts tending to prove the second element. They failed to show that those dangers associated with Fentanyl are not within the knowledge of or obvious to the ordinary user. Several anesthesiologists who work with Fentanyl almost daily said in their depositions that they know of those dangers and that they take action in light of the danger. Dr. Lewis, the anesthesiologist who treated Mr. Cooper, stated that he knows of those dangers. He also stated that he gave a muscle relaxant to Mr. Cooper and that Mr. Cooper was placed *1191 on a respirator. There is no question that these dangers are within the knowledge of and obvious to the ordinary user of Fentanyl.
Plaintiffs argue that the Court must consider not only the knowledge of anesthesiologists, but also the knowledge of other hospital workers, such as ICU nurses and internists, since they also care for patients under the effects of Fentanyl.
The Court disagrees. Since Fentanyl is a prescription drug, Janssen's duty was to adequately warn Dr. Lewis, the doctor who made the decision to use the drug. See Rhoto v. Ribando, 504 So.2d 1119 (La.App. 5 Cir.1987), writ denied. Rhoto addressed the manufacturer's duty to warn the doctor who would make that decision. It did not address the need to warn other hospital workers as plaintiffs suggest here. However, the Court feels that this case warrants the same result. Dr. Lewis was the prescribing physician. It was his duty to apply the proper standards of medical care in giving instructions and in otherwise managing the patient. The Court finds no authority suggesting that the manufacturer must assume that duty.
Concerning the third element, plaintiffs did show that Janssen failed to warn about fever and movements of the extremities associated with muscle rigidity. No one disputes this.
Finally, and for the reasons stated above, the Court finds that plaintiffs cannot prove the fourth element, which is causation.
In summary, plaintiffs failed to show that the dangers involved were outside the knowledge of the ordinary user of Fentanyl, and, in addition, they cannot show causation. Since they did not present enough facts to prove their case, the Court finds that Janssen is entitled to judgment as a matter of law.
NOTES
[1] Darrell Cooper's father, Henry J. Cooper, was named as a plaintiff but did not testify at trial, was not even present at trial, and in fact, was not mentioned anywhere in these proceedings other than to be named as a plaintiff in certain pleadings. No judgment was rendered in his favor. Darrell Cooper's siblings, Gregory, Gary, and Pamela Cooper, and his fiancee, Cherlita Hall, were also named as plaintiffs but were dismissed on an exception of no cause of action.
[2] La.R.S. 40:1299.44(C)(5) provides in pertinent part:

In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of $100,000.00, or where the self-insured health care provider has paid $100,000.00.
[3] La.R.S. 40:1299.42(B) provides that the total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed $500,000.00, plus interest and costs.
[4] After oral arguments were heard, this Court was notified that Cooper and the Fund had settled the damages portion of this case. As we had already reached a decision on the substantive issues involved in that portion of the appeal prior to such notification, we choose to address those issues for the sake of completeness and formality.
[5] The anesthesia record from Cooper's surgery was lost. However, the hospital billing records indicate that Sublimaze was used during the surgery because Cooper was billed for it.
[6] We discern in the record a striking dissimilarity between Dr. Ule's testimony and that of Dr. Speeg. Dr. Ule was apparently a reluctant witness; she gave little information and no opinions on this case at all. At one point, Dr. Ule even stated, "we have clinical suspicions as to the cause" of the fever and seizures, yet she never revealed what those suspicions were. By contrast, Dr. Speeg, as a retained expert, was of course a very willing witness who opined on many subjects. This distinction may have raised the question of who was more credible, a reluctant fact witness or a paid expert, a decision properly left to the fact finder.